**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **HIGHPOINT RISK SERVICES, LLC,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:14-cv-3398-L** |
| | § | |
| **COMPANION PROPERTY & CASUALTY** | § | |
| **INSURANCE COMPANY,** | § | |
| | § | |
| **DEFENDANT.** | § | |

---

**APPENDIX IN SUPPORT OF
DEFENDANT'S MOTION TO TRANSFER VENUE AND BRIEF IN SUPPORT
(SUBJECT TO DEFENDANT'S MOTION TO DISMISS)**

---

Defendant Companion Property & Casualty Insurance Company submits the following Appendix in Support of Defendant's Motion to Transfer Venue and Brief in Support (Subject to Defendant's Motion to Dismiss):

| DESCRIPTION | APPENDIX PAGE |
|---|---|
| Declaration of Jennifer Adams | 3 |
| Declaration of Harry Lee in Support of Defendant's Motion to Transfer Venue | 11 |
| Exhibit A – Coverage Agreement | 12 |
| Exhibit B – Guaranty and Indemnity Agreement | 22 |
| Exhibit C – Third Party Claims Administration Agreement | 29 |

**Dated: October 16, 2014**

**APPENDIX IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE AND BRIEF IN SUPPORT
(SUBJECT TO DEFENDANT'S MOTION TO DISMISS) - PAGE 1**

PAGE 1

Respectfully submitted,


/s/ D. Ronald Reneker
D. Ronald Reneker, Attorney in Charge
Texas Bar No. 16770000
rreneker@munsch.com
John L. Thompson
Texas Bar No. 90001820
jthompson@munsch.com

**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Tel: (214) 855-7500
Fax: (214) 855-7584

**ATTORNEYS FOR DEFENDANT
COMPANION PROPERTY AND
CASUALTY INSURANCE COMPANY**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record by means of CM/ECF E-SERVICE this 16th day of October, 2014.


/s/ D. Ronald Reneker


**APPENDIX IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE AND BRIEF IN SUPPORT (SUBJECT TO DEFENDANT'S MOTION TO DISMISS) - PAGE 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHPOINT RISK SERVICES, LLC, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-cv-3398-L |
| | § | |
| COMPANION PROPERTY & CASUALTY | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| DEFENDANT. | § | |

## DECLARATION OF JENNIFER ADAMS

I, Jennifer Adams, do solemnly swear as follows:

1. I am over 21 years of age, of sound mind, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify regarding the matters described herein. I am a citizen and resident of South Carolina.

2. I currently serve as the Program Administrator for Companion Property and Casualty Insurance Company ("Companion") and have been employed by Companion since September of 2012. Prior to this employment, I worked at Companion from July 2000 to August 2010. My current responsibilities include oversight and management of Companion's "Limited Risk" team. "Limited Risk" refers to insurance programs in which Companion allows managing general agents to produce Companion insurance policies, reinsure the losses under those policies in exchange for Companion ceding premium received for those policies, and often handle claims administration of those policies. These types of "Limited Risk" insurance programs are also known as "fronting" programs.

3. It is my understanding and belief that, until some point in late 2013, Freestone Insurance Company ("Freestone") was known as Dallas National Insurance Company ("Dallas

1

National") and was owned and operated by Charles David Wood, Jr. Mr. Wood owns other insurance-related entities, including but not limited to an insurance agency known as Highpoint Risk Services, LLC ("Highpoint") and a claims administration company known as Aspen Administrators, Inc. Mr. Wood also owned a Cayman-based reinsurance company known as Redwood Reinsurance SPC, Ltd. ("Redwood") until it was sold to the purchasers of Freestone in a related transaction.  Each of these companies was a part of a fronting program between Freestone and Companion (the "Wood Program").

4.  Freestone is currently in a receivership liquidation proceeding under the control of the State of Delaware (the "Freestone Liquidation"). I have led Companion's Limited Risk team's management and review of the Wood Program since the Freestone Liquidation. As such, I have personal knowledge of the matters set forth herein.

5.  Some of the Companion insurance policies produced by Highpoint under the Wood Program have been called "PayGo" policies. Under the Wood Program, "PayGo" generally means the workers' compensation business produced by Highpoint and Freestone on Companion policies that were not issued to one of Mr. Wood's professional staff leasing companies. "PayGo" policies produced by Highpoint and reported to Companion under the Wood Program were reinsured by two of Mr. Wood's insurance entities, Dallas National and Redwood.

6.  Parker Moore manages Companion's claims division in connection with the Wood Program. Mr. Moore is a citizen and resident of South Carolina. Mr. Moore has had direct responsibility for the management of claims on PayGo policies produced by Highpoint under the Wood Program.

2

7.   Michael Downs is a claims supervisor who oversees the third party administrators handling a portion of the claims on policies produced by Highpoint. Mr. Downs is a citizen and reside of South Carolina under the Wood Program.

8.   Kate Martinko, Sherry Branham, and Jennifer Weidemiller all worked under Mr. Moore's supervision as claims adjusters relating to specific claims on policies produced by Highpoint under the Wood Program.  Ms. Martinko and Ms. Weidemiller are current employees of Companion and citizens and residents of Florida.   Ms. Branham is a current employee of Companion and is a citizen and resident of South Carolina.

9.   Heather Crosby, Linda Taylor, Endia Thompson, and Dawn Williams are all current employees and citizens and residents of South Carolina. Their job responsibilities include processing new business and renewal policies for portions of the business produced by Highpoint under the Wood Program. Heather Crosby is also responsible for issuing all policy endorsements related to the policies produced by Highpoint under the Wood Program.

10.   Laurie Comfort is a current employee of Companion and works as the Director of Operations at Companion. She and Pam Bass, another current employee of Companion, have been responsible for managing the regulatory filings and records in connection with the policies produced by Highpoint under the Wood Program. Additionally, Ms. Comfort has been involved with investigations over agency issues, policy holder complaints, and governmental inquiries into the insurance policies produced by Highpoint under the Wood Program. Ms. Comfort and Ms. Bass are citizens and residents of South Carolina.

11. Tom Walsh and Deborah Gunter are citizens and residents of South Carolina and are current employees of Companion.  Mr. Walsh and Ms. Gunter are responsible for managing the premium audits on policies produced by Highpoint under the Wood Program, as well as managing and the related governmental reporting.

3

12. Marilyn Ramos is a citizen and resident of South Carolina and is a current employee of Companion. Ms. Ramos has performed underwriting audits of the policies issued by Highpoint under the Wood Program.

13. Christina Wania is a current employee of Companion and is responsible for analyzing premium and claims for Companion's statutory reporting on the business produced by Highpoint under the Wood Program. Ms. Wania is a citizen and resident of South Carolina.

14. Jeri Boysia, Companion's VP and Actuary, and Zach Alford are current employees of Companion and are citizens and residents of South Carolina.  Xuan Li is a South Carolina resident alien.  Ms. Boysia, Ms. Li, and Mr. Alford are each actuaries that have responsibility for the review and actuarial analysis performed in connection with the Wood Program.

15. Carrie Caudle, Rosa Hipolito, Doris Morton, and Kenyatta Miller are citizens and residents of South Carolina.  Ms. Caudle and Ms. Miller are current Companion employees, and Ms. Hipolito and Ms. Morton and former Companion employees.  These current and former employees have been responsible for Companion's preparation and filing of agency appointments for Highpoint in connection with the policies under the Wood Program.

16. Curtis Stewart is a former officer and employee of Companion and is a citizen and resident of South Carolina. Mr. Stewart was Companion's Chief Financial Officer from the inception of the Wood Program in 2005 until approximately May 2011. Mr. Stewart was involved in regular communication with Mr. Wood regarding the establishment and operation of the Wood Program.

17. Rex Boylston is a former employee of Companion and is a citizen and resident of South Carolina. Mr. Boylston was Companion's Director of Business Development until

4

approximately May 2011. Mr. Boylston worked closely with Mr. Stewart and Mr. Wood on establishing the Wood Program.

18. Phil Segui is a former employee of Companion and is a citizen and resident of South Carolina. Mr. Sequi once was the Director of Underwriting for Companion. In that capacity, Mr. Segui worked with Highpoint in the creation of the underwriting guidelines for the PayGo portion of the Wood Program. He also performed underwriting audits of the Wood Program.

19. Josh Livingston, Companion's current Director of Business Development, and Kevin Elmore worked with Mr. Stewart in the establishment and early operations of the Wood Program. Mr. Livingston and Mr. Elmore are current employees of Companion and are citizens and residents of South Carolina.

20. Jennifer Thorne, Companion's Chief Financial Officer, Laura Simpson, Joe Lapaglia, Scott Sendler and Thomas Kassekert are all current employees of Companion and are citizens and residents of South Carolina. They have received written communications and reports produced by Highpoint and Freestone in connection with the Wood Program. These reports reflect details of the policies, such as policy information, premiums, front fees, commissions, taxes, claims payments, and other details related to Highpoint's issuance of policies and management of the Wood Program.

21. Matt Reynolds and Bob Shyrock are former employees of Companion and are citizens and residents of South Carolina. Mr. Reynolds led Companion's overall investigation into Highpoint-produced business under the Wood Program for a period of time after April 2014, when the financial concerns at Freestone were disclosed by it to Companion. Mr. Shyrock oversaw loss prevention and loss control at Companion. Mr. Shyrock helped establish Companion's loss prevention programs for the policies produced by Highpoint under the Wood Program.

5

22. Jay Cogswell is a citizen and resident of New Jersey and a former employee of Companion. From June 2012 until March 2014, Mr. Cogswell was Companion's lead Limited Risk Officer. In that capacity, Mr. Cogswell had regular interactions and communications with Highpoint and its affiliates regarding the Wood Program. Mr. Cogswell still owns a home in Columbia, South Carolina.

23. Curt Docktor is a former employee of Companion. I believe Mr. Docktor is still a citizen and resident of South Carolina, although he may have recently moved to Atlanta, Georgia. Mr. Docktor held the position I now hold and was involved in Companion's management of the Wood Program through 2012.

24. Warren Isom is a current employee of Companion and is a citizen and resident of Pennsylvania. Mr. Isom commutes to Columbia, South Carolina for his work and spends the majority of his time in Columbia, South Carolina. Mr. Isom has been involved in investigating a portion of the business produced by Highpoint under the Wood Program that is known as the "Vensure Program."

25. Gordon Dobson Jr. is a citizen and resident of South Carolina.  Mr. Dobson is responsible for performing underwriting and operational audits at Companion, and he has performed these audits in connection with the Wood Program.

26. Gordon Dobson Sr. is a citizen and resident of South Carolina.  Mr. Dobson is responsible for communications between existing Freestone employees and the State of Delaware on issues relating to the Wood Program.

27. Troy Santora, Companion's Chief Reinsurance Officer, and Maryanne Brown are current employees of Companion.  Mr. Santora is a citizen and resident of South Carolina.  Ms.

6

Brown is a citizen and resident of Pennsylvania.  Mr. Santora and Ms. Brown are responsible for third-party reinsurance, including managing reinsurance claims, related to the Wood Program.

28. Bill Merton is a citizen and resident of South Carolina.  Mr. Merton is responsible for analyzing billing issues and security funds collected by Highpoint and held on behalf of Companion insureds under the Wood Program.

29. Highpoint produced approximately 8,400 PayGo insurance policies under the Wood Program from its inception in 2005 and has experienced thousands of claims under those policies. As a result of the size and scope of the Wood Program, including the PayGo portion, Companion maintains countless volumes of records associated with the Wood Program in Columbia, South Carolina. While Companion does maintain some hard copy files, such as claims files, Companion primarily stores policy records, invoices, audit records, underwriting files, claims files, borderaux reports, regulatory filings, agency appointments, financial reports and compilations, actuarial analysis, email correspondence, billing records, investigatory records from third parties and accountants, and other records created and maintained in connection with the Wood Program in electronic form in Columbia, South Carolina.

30. I understand that Freestone and Highpoint, at least through March 31, 2013, while they were both owned and operated by Mr. Wood, operated and maintained their records on a shared server system. This server data, which is currently in the possession of the Delaware-appointed receiver managing the Freestone Liquidation, is in the process of being migrated to Companion's servers in Columbia, South Carolina for ongoing business purposes in the course of the Freestone receivership.

31. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

7

Executed on October 14, 2014

Jennifer Adams

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHPOINT RISK SERVICES, LLC, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-cv-3398-L |
| | § | |
| COMPANION PROPERTY & CASUALTY | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| DEFENDANT. | § | |

DECLARATION OF HARRY LEE IN SUPPORT OF
DEFENDANT'S MOTION TO TRANSFER VENUE

I, Harry Lee, am over 18 years of age and competent to testify regarding the matters described herein, have personal knowledge of the matters contained in this declaration and do solemnly swear as follows:

1.      I submit this declaration in support of Defendant's Motion to Transfer Venue.

2.      I am a member in good standing of the Maryland and District of Columbia bars, a number of federal district and circuit courts and the United States Supreme Court.

3.      I am a partner at the law firm of Steptoe & Johnson LLP, counsel for Defendant Companion Property & Casualty Insurance Company.

4.      Attached hereto are true and correct copies of the following exhibits to Defendant's Motion to Transfer Venue:

- Exhibit A:  "Coverage Agreement" entered into on December 1, 2006.

- Exhibit B:  "Guaranty and Indemnity Agreement" entered into on December 1, 2006.

- Exhibit C:  "Third Party Claims Administration Agreement" entered into on December 1, 2006.

5.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1*4*, 2014

_____
Harry Lee

- 1 -

# Exhibit A
## (Coverage Agreement)

## EXTENSION AGREEMENT #12

The undersigned (the "Parties") are the parties to that certain Coverage Agreement dated as of December 1, 2006 (the "Coverage Agreement"). The Coverage Agreement's expiration date was previously extended from December 1, 2011 to March 31, 2013. The Parties hereby agree to further extend the term of the Coverage Agreement until such time as either Companion Property and Casualty Insurance Company or Dallas National Insurance Company gives the other thirty (30) days' prior written notice of termination. All other provisions of the Coverage Agreement remain in full force and effect.

EXECUTED AND DELIVERED as of March 31, 2013.

SIGNATURES:

COMPANION PROPERTY AND CASUALTY INSURANCE COMPANY

BY: _____
TITLE: _____

DALLAS NATIONAL INSURANCE COMPANY

BY: _____
TITLE: _____

AMS STAFF LEASING INC.

BY: _____
TITLE: _____ PRESIDENT

AMS STAFF LEASING II INC.

BY: _____
TITLE: _____ PRESIDENT

AMS STAFF LEASING NA

BY: _____
TITLE: _____

PERSONNEL ADVANTAGE EAST, INC.

BY: _____
TITLE: _____ PRESIDENT

EQUITY GROUP LEASING I, INC.

BY: _____
TITLE: _____ PRESIDENT

<u>Companion Property & Casualty Insurance Company</u>

<u>LEGAL AGREEMENTS</u>

<u>With</u>

<u>Dallas National Insurance Company</u>

<u>For</u>

<u>Workers Compensation and</u>

<u>Commercial General Liability Business</u>

<u>Coverage Agreement</u>

<u>Exhibit A – TPA Agreement</u>

 Exhibit A-1:  Instructions

 Exhibit A-2:  Fees & Charges

 Exhibit A-3:  Insurance Required

 Exhibit A-4:  Claims and Allocated Loss Adjustment Expense

 Exhibit A-5:  Data Elements

<u>Exhibit B – Guaranty and Indemnity Agreement</u>

 Exhibit B-1:  Pledge Agreement

## COVERAGE AGREEMENT

**1. Parties.** This Coverage Agreement (the "Agreement") is made as of the date set forth on the signature page below ("Effective Date"), by and between, on the one hand, COMPANION PROPERTY AND CASUALTY INSURANCE COMPANY, a South Carolina corporation ("CPCIC"), and on the other hand DALLAS NATIONAL INSURANCE COMPANY (successor by merger to DALLAS FIRE INSURANCE COMPANY) ("DN"), AMS STAFF LEASING INC., a Florida corporation ("AMS"), BRECKENRIDGE ENTERPRISES, INC. d/b/a AMS STAFF LEASING II, a Texas corporation ("AMS II"), PERSONNEL ADVANTAGE EAST, INC., a Florida corporation ("AEI"), and EQUITY GROUP LEASING I, INC., a Florida corporation ("EGLI"). AMS, AMS II, AMS NA, DN and EGLI are sometimes collectively referred to in this Agreement as the "AMS Entities". CPCIC and the AMS Entities are sometimes referred to in this Agreement collectively as the "Parties" and each separately as a "Party". The AMS Entities enter into and make this Agreement jointly and severally.

**2. Background.** AMS, AMS II, AMS NA, AEI and EGLI are all professional employer organizations whose clients primarily consist of construction contractors other than general contractors. These entities wish to obtain one or more workers compensation insurance policies to provide coverage over their employees serving these clients (the "Master Policies"). CPCIC is also willing to write both high and low deductible workers' compensation and commercial general liability policies of insurance (together with the Master Policies, the "Policies") and CPCIC is willing to issue these Policies in states where it is licensed, subject to and in accordance with this Agreement and the requirements of applicable law. DN agrees to provide reinsurance and underwriting and administrative services to CPCIC for the Policies.

**3. Coverage Term.** The coverage term of this contract shall commence at 12:01 A.M. Eastern time December 1, 2006 and terminate at 12:01 A.M. Eastern time December 1, 2011.

**4. Covered States.**

      a. No Policies shall be written by CPCIC in any state where CPCIC is not licensed or where CPCIC otherwise determines in its sole discretion not to issue any Policies.

      b. Master Policies shall be issued in Texas and Florida. Workers' Compensation Policies other than Master Policies and Commercial General Liability Policies shall be issued in such states as are mutually agreed between the Parties.

      c. Additional states may be added by mutual agreement of Parties and only with written authorization (e-mail is acceptable) by CPCIC.

- 2 -

5. **Coverage Limits.**

   a. Each Workers' Compensation Policy shall be subject to the following coverage limits:

   | Type | Limit |
   | --- | --- |
   | Coverage A: Workers Compensation | Statutory Limits |
   | Coverage B: Employers Liability | $1,000,000 each accident |
   | Disease Policy Limit | $1,000,000 |
   | Disease Per Employee | $1,000,000 |
   | Foreign Reimbursement | Statutory Limits |
   | Repatriation | $50,000 |

   b. Each General Liability Policy shall be subject to the coverage limit of $1 million ($1,000,000.00).

6. **Deductible.** The Policies, except for the Master Policies, subject to underwriting requirements, may have any deductible amount available pursuant to the filed rates available in the states of coverage of the Policies. The Master Policies shall have a per occurrence deductible of $1,000,000.

7. **Issuance.** CPCIC shall issue the Policies as requested by the AMS Entities subject to the following requirements: (i) All companies with respect to which Policies are issued must meet the underwriting requirements established from time to time by CPCIC and the reinsurers provided for herein; and (ii) the aggregate liability exposure of CPCIC in respect of the Policies shall be acceptable to CPCIC in its sole discretion. CPCIC shall have the right upon request during normal business hours to audit the AMS Entities' records (including without limitation payroll and class codes) with respect to the companies covered by any Policy.

8. **Reinsurance.** With respect to (a) workers' compensation Policies, DN shall reinsure the first $5,000,000 of risk (less any applicable deductible acceptable to CPCIC) under the Policies and (b) commercial general liability Policies, DN shall reinsure up to $500,000 of risk (less any applicable deductible acceptable to CPCIC) under the Policies, each pursuant to a reinsurance policy in form and substance acceptable to CPCIC. The next layers of risk ($25,000,000 of risk for workers' compensation Policies and each of the balances of the risk over $500,000, if any, covered under each of the commercial general liability Policies) under the Policies shall be reinsured by a company acceptable to CPCIC pursuant to a reinsurance policy in form and substance acceptable to CPCIC.

9. **Consideration.** Notwithstanding any other provision hereof, CPCIC shall receive in respect of all accommodations contemplated hereby net consideration in an amount equal to not less than six percent (6%) of the Standard Gross Manual Premium with respect to the Policies. Such consideration shall be paid monthly.

- 3 -

**10. Costs and Expenses.**  All costs and expenses incurred in connection with the Policies shall be the sole responsibility of the AMS Entities, jointly and severally, and CPCIC shall have absolutely no liability whatsoever in respect thereof.  Without limiting the generality of the foregoing such costs and expenses shall include state taxes and assessments; fines and penalties attributable to any delay or wrongful act of AMS; reinsurance fees;  State Boards;  and accounting, legal, actuarial and claims administration costs.  Such costs and expenses shall also include (in addition to the consideration due CPCIC under paragraph 9 hereinabove)

(i)    a policy issuance fee due CPCIC in the amount of 1.5% of earned premium with respect to the Policies issued under this Agreement, and

(ii)   Taxes and Assessments charge of 9.02% of Written Premium with respect to the Policies issued under this Agreement, and

(iii)  Reinsurance charge of 1.75% of Standard Premium with respect to the Policies issued under this Agreement, and

(iv)   A claims management fee of 8.0% of Standard Premium with respect to the Policies issued under this Agreement, and

(v)    A retail commission of 15.0% of Standard Premium will be paid to Highpoint Risk Services LLC for production of Policies with respect to this Agreement.

**11. Premiums.**  Premium charges for the Policies shall be remitted monthly by the 10th day of the calendar month.  Remittance shall be made by wire transfer to a bank account designated by CPCIC.  An advisory as to each remittance listing all covered employees by social security number, class code, compensation and manual rate by class code shall be mailed and emailed to CPCIC on the date the remittance is made in a form and structure provided by CPCIC..

**12. Claims Administration.**  Aspen Administrators ("Aspen") shall act as third party claims administrator for CPCIC with respect to the Policies pursuant to a Third Party Claims Administration Agreement in the form attached hereto as Exhibit C (the "TPCA Agreement").  Aspen.  Aspen Administrators shall invoice the appropriate AMS Entity for all incurred claims on a periodic basis and terms acceptable to CPCIC.  All invoice payments shall be deposited into the Aspen Claims Operating Account established pursuant to the TPCA Agreement and all claims shall be paid from such account.

**13. Claims Collateral.**  During the Coverage Term of the Master Policies, CPCIC shall establish and maintain in its name with the Bank of America an account to serve as a claims reserve fund (the "Claims Reserve Fund").  At the commencement of the Coverage Term the AMS Entities shall make an initial deposit of $1,000,000 into the Claims Reserve Fund as the initial "Required Reserve".  Thereafter, on a quarterly basis the Milliman consulting firm ("Milliman") shall audit the claims experience in connection with the Policies and determine the appropriate amount of the Required Reserve for the next quarter in accordance with a methodology acceptable to CPCIC in its sole discretion.  As actual claims are incurred the AMS Entities shall deposit into the Claims Reserve Fund the amount of such claims on a monthly basis by the 10th day of the

- 4 -

calendar month so that the Required Reserve is maintained in the Claims Reserve Fund at all times.  CPCIC shall have the right at any time during normal business hours to audit the records of any AMS Entity with respect to claims and the Claims Reserve Fund.  All earnings on the Claims Reserve Fund shall belong to CPCIC and no AMS Entity shall have any interest therein.  DN will be responsible for scheduling and paying for the Milliman audits on a quarterly basis and providing CPCIC copies of these reserve reports within 45 days of the close of the quarter.  All earnings on funds held within the Claims Reserve Fund will inure to the benefit of CPCIC.

**14. Letter of Credit.**  So long as CPCIC has any potential liability under any Policy, an AMS Entity shall cause a Letter of Credit to be issued and maintained in favor of CPCIC as beneficiary in the stated amount required by CPCIC from time to time and payable upon written certification by CPCIC of either (i) a default by any AMS Entity under this Agreement or any other agreement with or in favor of CPCIC, or (ii) a default under the Guaranty and Indemnity Agreement referred to in paragraph 15 hereinbelow.  Initially the stated amount of such Letter of Credit shall be $20,000,000.  Should CPCIC require an increase in the stated amount of the Letter of Credit such increase shall be effected by the AMS Entities within five business days of written notice of such requirement.  The Letter of Credit documentation and issuer shall be acceptable to CPCIC in its sole discretion.  CPCIC shall not act in bad faith in calling the Letter of Credit.  The absence of such bad faith is conclusively established if at the time the Letter of Credit is called an AMS Entity default under this Agreement or the Guaranty and Indemnity Agreement referred to in paragraph 15 hereinbelow either actually existed or was reasonably believed by CPCIC to exist.

**15. Guarantee.**  As an essential inducement to CPCIC to enter into this Agreement and issue the Policies, Charles D. Wood, Jr. issued in favor of CPCIC the guaranty and indemnity agreement attached hereto as <u>Exhibit B</u>.

**16. Default and Remedies.**  Each and every obligation of each AMS Entity under this Agreement is an essential term hereof and shall entitle CPCIC to the exercise of any and all remedies provided by law or available in equity.  CPCIC shall have the right to exercise its remedies in any order and forbearance in the exercise of any remedy shall not constitute a waiver of the right to exercise such remedy at a future time or a waiver of the right to exercise any other remedy.

**17. AMS Entities' Representations.**  Each of the AMS Entities represents and warrants as follows: (i) the recitals in paragraphs 1 and 2 hereof with respect to any AMS Entity are true and accurate; (ii) Charles David Wood, Jr. owns all of the equity and voting interests of every nature and description in each AMS Entity; (iii) each AMS Entity is duly organized and validly existing under the laws of its domicile; (iv) each AMS Entity is in good standing in every jurisdiction where it engages in activities requiring qualification to do business; (v) each AMS Entity has full power and authority to conduct its business as currently conducted and to enter into this Agreement; and (vi) as to each AMS Entity, neither entering into this Agreement nor performing or observing any obligation or covenant hereunder violates, conflicts with or constitutes a default (or grounds for a default) under, any applicable law, regulation, rule, order or other mandate or restriction of any governmental entity, nor any provision of its charter,

- 5 -

bylaws or similar document, nor any provision of any agreement to which it is a party or by which it is bound. Such representations are made as of the date this Agreement is executed. In the event one or more of the AMS Entities is alleged to lack good standing in any jurisdiction in which it is doing business, CPCIC will allow 45 days to correct such standing and no breach of these representations will have occurred.

18. **Entire Agreement.** This Agreement (including the exhibits, schedules and other attachments referred to in this Agreement) constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any prior understandings, representations or agreements by or between the Parties (whether written or oral) to the extent the same are related to the subject matter hereof.

19. **Succession and Assignment.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other Party.

20. **Notices.** All notices, consents, requests, demands, offers, reports or other communications required or permitted hereunder shall be in writing and sent by a prepaid receipted delivery service of the United States Postal Service, Federal Express, or United Parcel Service to the Parties at their respective addresses set forth opposite their signatures hereinbelow. All notices, consents or other communications shall be deemed given and received on the date set forth on the delivery receipt of the courier service in question.

21. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina without giving effect to any choice or conflict of law provision or rule (whether of the State of South Carolina or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of South Carolina.

22. **Litigation.** The state and federal courts located in Richland County, South Carolina shall be the exclusive forums for all litigation or other proceedings initiated by any Party under or in connection with this Agreement or the subject matter hereof. Each Party consents to the jurisdiction of such courts and agrees that venue in such courts shall be convenient and proper in connection with all such litigation and proceedings. Each Party agrees not to (i) contest the jurisdiction or venue of such courts in any such action or proceeding, or (ii) commence any such action or proceeding in any other forum. Each Party consents to service of process by U.S. mail in connection with any such litigation or proceedings, so long as such service is addressed to the person signing below on behalf of the entity being served and is sent via registered or certified mail.

23. **Further Assurances.** Each AMS Entity shall execute, deliver, acknowledge or supply such further documents, instruments and assurances as CPCIC considers necessary or appropriate to carry out the full intent and purposes of this Agreement, including but not limited to the filing of either a copy of this Agreement or a Memorandum of this Agreement with the applicable government authorities.

- 6 -

24. **Binding Effect.** This Agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by and against all the Parties and their respective heirs, legal representatives, personal representatives, successors and permitted assigns.

25. **Construction.** The paragraph headings in this Agreement are intended only to facilitate reference, and shall not affect the meaning or interpretation of any provision of this Agreement. The terms "herein", "hereby", "hereunder", "hereof", "hereinbefore", "hereinafter", and other equivalent words refer to this Agreement in its entirety and not solely to the particular portion of the Agreement in which such word is used. Reference to "this paragraph", "this clause", or a similar reference to a specific part of this Agreement shall refer to the particular paragraph, clause or other specific part in which such reference appears. Any pronoun used in this Agreement shall be deemed to include both the singular and plural and all genders.

26. **Priority.** Except as otherwise required by applicable law, in the event of any conflict or inconsistency between the terms or provisions of the Act and the terms or provisions of this Agreement, this Agreement shall control.

27. **Amendment.** No provision of this Agreement may be amended or waived except pursuant to a writing signed by all of the Parties.

28. **Waivers.** No waiver of any breach of any covenant, agreement or undertaking contained in this Agreement shall operate as a waiver of any subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

29. **Time of the Essence.** Time is of the essence with respect to each and every obligation of each Party under this Agreement.

30. **JURY TRIAL WAIVER.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH AMS ENTITY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BETWEEN ANY AMS ENTITY AND CPCIC DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY DISPUTES RELATING HERETO OR THERTO. EACH AMS ENTITY ACKNOWLEDGES THAT CPCIC HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THIS WAIVER.

31. **Execution.** In witness of the foregoing the Parties have caused this Agreement to be duly executed and delivered as of December 1, 2006.

- 7 -

**NOTICE ADDRESSES:**

P.O. Box 100159
51 Clemson Road (29229)
Columbia SC 29202-3159
Attention: Charles M. Potok

14160 Dallas Parkway
Suite 1500
Dallas, TX 75274
Attention: Charles David Wood, Jr.

14160 Dallas Parkway
Suite 1500
Dallas, TX 75274
Attention: Charles David Wood, Jr.

14160 Dallas Parkway
Suite 1500
Dallas, TX 75274
Attention: Charles David Wood, Jr.

14160 Dallas Parkway
Suite 1500
Dallas, TX 75274
Attention: Charles David Wood, Jr.

14160 Dallas Parkway
Suite 1500
Dallas, TX 75274
Attention: Charles David Wood, Jr.

14160 Dallas Parkway
Suite 1500
Dallas, TX 75274
Attention: Charles David Wood, Jr.

**SIGNATURES:**

COMPANION PROPERTY AND CASUALTY
INSURANCE COMPANY
BY:
TITLE: Presinent

DALLAS        NATIONAL        INSURANCE
COMPANY
BY:
TITLE: President

AMS STAFF LEASING INC.
BY: C. D. Wood Jr.
TITLE:

AMS STAFF LEASING II INC.
BY: C. D. Wood Jr.
TITLE:

AMS STAFF LEASING NA
BY: C. D. Wood Jr.
TITLE:

PERSONNEL ADVANTAGE EAST, INC.
BY: C. D. Wood Jr.
TITLE:

EQUITY GROUP LEASING I, INC.
BY: C. D. Wood Jr.
TITLE:

- 8 -

# Exhibit B
## (Guaranty and Indemnity Agreement)

EXHIBIT B

## GUARANTY AND INDEMNITY AGREEMENT

This Guaranty and Indemnity Agreement (the "Agreement") is made and given by Charles David Wood, Jr. ("GUARANTOR") as of the date set forth on the signature page hereof for the benefit of Companion Property and Casualty Insurance Company and its Affiliates as defined below ("COMPANY").

**Background.** This Agreement is the Guaranty and Indemnity Agreement contemplated by that certain Coverage Agreement of even date herewith by and between Company and Dallas National Insurance Company (successor by merger to Dallas Fire Insurance Company), AMS Staff Leasing Inc., a Florida corporation, Breckenridge Enterprises, Inc. d/b/a AMS Staff Leasing II, a Texas corporation, Personnel Advantage East, Inc., a Florida corporation, and Equity Group Leasing I, Inc., a Florida corporation (the "Coverage Agreement:).    All terms not otherwise defined herein shall have the meanings ascribed to them in the Coverage Agreement. GUARANTOR owns all of the stock or other equity and voting interests in each of the AMS Entities (collectively referred to herein, except for the stock of Dallas National Insurance Company, as the "AMS STOCK"). Each AMS Entity is sometimes referred to herein as an "OBLIGOR". The Coverage Agreement, the Policies and the TPCA Agreement are sometimes referred to herein collectively as the "Subject Agreements".    COMPANY and GUARANTOR wish to ensure that COMPANY incurs no pecuniary liability whatsoever by entering into the Subject Agreements.  As a condition precedent to COMPANY's willingness to enter into the Subject Agreements, COMPANY has insisted upon GUARANTOR providing, and GUARANTOR is willing to provide, this Guaranty and Indemnity Agreement for the benefit of COMPANY.

**NOW THEREFORE** in consideration of the premises, the direct or indirect financial interest of GUARANTOR in each OBLIGOR, and as a material inducement to COMPANY to enter into the Subject Agreements, and for other good and valuable consideration, receipt of which is hereby acknowledged by GUARANTOR, GUARANTOR intending to be legally bound, agrees as follows:

I.    Guaranty of Performance and Payment:

   A.   GUARANTOR hereby absolutely and unconditionally guarantees to COMPANY the full and prompt performance and payment, when due, of all obligations of each OBLIGOR under the Subject Agreements. As used in this Agreement, "prompt" or "promptly" means unconditionally, without request for extension, and within thirty (30) days of COMPANY's written demand for payment.

   B.   This Agreement is a guaranty of performance and of payment and not of collection, and the liability of GUARANTOR hereunder is direct and unconditional and may be enforced by COMPANY without first resorting to any right or remedy against any OBLIGOR or any other person.

PAGE 23

II.   Indemnity:

    A.   GUARANTOR hereby agrees to indemnify and hold harmless COMPANY, and all shareholders, officers, directors, employees and other agents of COMPANY, from and against any and all claims, suits, hearings, proceedings, actions, damages, liabilities, fines, penalties, losses, costs or expenses, including without limitation reasonable attorney's fees, at any time arising out of or otherwise related to, directly or indirectly, the Subject Agreements.

    B.   GUARANTOR shall further pay all reasonable expenses, including without limitation, attorney's fees and other legal expenses, paid or incurred by COMPANY in collecting amounts owed hereunder or otherwise enforcing this Agreement.

III.   Demand:

    A.   GUARANTOR, within thirty (30) days of receipt of COMPANY's written demand from time to time, shall (as applicable):

        1.   Perform for the benefit of COMPANY any performance obligation of any OBLIGOR under any Subject Agreement that has not been timely performed;

        2.   Pay to COMPANY in full in cash or immediately available funds any amount due and owing to COMPANY from any OBLIGOR under any Subject Agreement that has not been timely paid; or

        3.   Pay to COMPANY in cash or immediately available funds any and all amounts owing in respect of GUARANTOR's indemnity under Section I.B hereinabove.

IV.   Continuing Performance:

    A.   This Agreement is irrevocable and may not be terminated by GUARANTOR at any time for any reason.  The liability of GUARANTOR under this Agreement shall:

        1.   Be continuing, primary, absolute, and unconditional irrespective of any amendment, modification or waiver of any provision of any Subject Agreement or any other guaranty or other agreement or instrument related to any Subject Agreement, including without limitation any change in the time, manner, or place of payment or performance of any obligation under any Subject Agreement or such related agreement; and

        2.   Not be impaired by any extension of time or other waiver or grace granted for any default either (i) by any OBLIGOR in the performance or payment of any obligation under any Subject Agreement, or (ii) by any other guarantor of any obligation of any Obligor.

- 2 -

B.   COMPANY may, from time to time, at its sole discretion and without notice to GUARANTOR, amend, waive, release, compromise, extend or renew for an additional period of time, or otherwise modify (in whole or in part) any Subject Agreement or any other guaranty or other agreement or instrument related to any Subject Agreement.

C.   If, at any time, all or any part of any payment heretofore applied by COMPANY to any obligation of an OBLIGOR under a Subject Agreement is or must be rescinded or returned by COMPANY for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of any policyholder, OBLIGOR, or other guarantor), such OBLIGOR's obligation shall, for the purposes of this Agreement, to the extent that payment is or must be rescinded or returned, be deemed to have continued in existence, not withstanding application by COMPANY, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to the OBLIGOR's obligation, all as though such application by COMPANY had not been made.

## V.   Collateral:

To secure GUARANTOR's obligations under this Agreement GUARANTOR shall grant COMPANY a first priority lien and security interest in all of the AMS Stock pursuant to a pledge agreement in the form attached hereto as <u>Exhibit B-1</u> and GUARANTOR shall execute and deliver such pledge agreement to COMPANY contemporaneously with the execution and delivery of this Agreement.

## VI.   Net Worth Maintenance:

A.   Contemporaneously with the execution and delivery of this Agreement GUARANTOR delivered to COMPANY a true and complete financial statement of GUARANTOR showing GUARANTOR's net worth as of the prior calendar year end determined in accordance with generally accepted accounting principles.

B.   GUARANTOR shall provide COMPANY with a new true and complete financial statement by June 1 of each calendar year showing GUARANTOR's net worth as of the prior calendar year end prepared by an independent certified public accountant in accordance with generally accepted accounting principles. Upon COMPANY'S request from time to time GUARANTOR shall promptly provide to COMPANY audited financial statements of any other GUARANTOR as of the then most recent fiscal year-end.

C.   Each financial statement of GUARANTOR provided to COMPANY pursuant to this Agreement shall be certified by GUARANTOR under oath as true, accurate and complete.

D.   GUARANTOR shall provide COMPANY with written notice if at any time there is a ten percent (10%) or greater diminution in GUARANTOR's net worth (determined in accordance with generally accepted accounting principles) from that reflected on GUARANTOR's initial financial statement provided to

- 3 -

COMPANY contemporaneously with the execution and delivery of this Agreement.

E. In the event of such a diminution upon COMPANY's demand GUARANTOR or other persons acceptable to COMPANY shall (in addition to any other collateral already provided to COMPANY) collateralize GUARANTOR's obligations hereunder with either, at COMPANY's option and direction, either: publicly traded securities having a current market value at all times equal to at least One Hundred Percent (100%) of such diminution pursuant to a pledge agreement, or a letter of credit in favor of COMPANY in the amount of such diminution issued by a bank and otherwise in form and substance satisfactory to COMPANY in its sole discretion.

VII. <u>Waivers:</u>

A. GUARANTOR hereby expressly waives notice of the acceptance of this Agreement and change of any conditions to any OBLIGOR's performance or payment or of any extensions of time to any OBLIGOR for performance or payment; and

B. GUARANTOR hereby expressly waives all diligence in collection or protection of or realization upon any OBLIGOR's assets or obligations and any requirement that COMPANY exhaust any right, power or remedy against any OBLIGOR.

VIII. <u>Postponement of Subrogation:</u>

GUARANTOR shall not exercise any rights which it may acquire by way of rights of subrogation in connection with this Agreement or by any payment made hereunder or otherwise until each and every obligation under the Subject Agreements has been paid and performed in full. Any amount paid to GUARANTOR on account of any such subrogation rights prior to the payment and performance in full of all obligations under the Subject Agreements shall be held in trust for the benefit of COMPANY and shall immediately be paid to COMPANY upon receipt thereof by GUARANTOR.

IX. <u>Other Terms and Conditions:</u>

A. <u>Affiliate:</u> For purposes of this Agreement, the term "Affiliate" shall mean any entity controlling, controlled by or under common control with (in each case whether directly or indirectly) Companion Property and Casualty Insurance Company.

B. <u>Notices:</u> All notices required or permitted under this Agreement shall be in writing, shall reference this Agreement, shall be addressed as set forth below, and shall be sent prepaid by either (i) registered or other form of U.S. mail that includes delivery verification; or (ii) a national commercial courier service that includes delivery verification. Any such delivery verification shall be conclusive evidence of delivery of the notice to the addressee and the date and time of such delivery. Addresses for notices shall be as follows, or such other address

- 4 -

as GUARANTOR or COMPANY, as applicable, may designate in a notice to the other given in accordance with this paragraph:

FOR GUARANTOR AND OBLIGORS:

Mr. Charles David Wood, Jr.
14160 Dallas Parkway, Suite 1500
Dallas, TX 75274

FOR COMPANY:

Companion Property and Casualty Insurance Company.
ATTN: Charles M. Potok, President
P.O. Box 100159
51 Clemson Road (29229)
Columbia SC 29202-3159

C.   Further Assurances:  At any time and from time to time GUARANTOR shall execute and deliver such further instruments and take such further action as may reasonably be requested by COMPANY to effect the purposes of this Agreement.

D.   Strict Compliance:  The failure of COMPANY to insist on strict compliance with any provision of this Agreement, or to exercise any right or remedy hereunder, shall not constitute a waiver or forfeiture of any rights herein set forth nor estop COMPANY in the future from demanding full and complete compliance with such provision nor prevent COMPANY from exercising such remedy.

E.   Severability:   The invalidity or unenforceability of any provision of this Agreement shall not render invalid or unenforceable any other provision hereof.

F.   Headings:  The headings preceding the text of the sections and paragraphs of this Agreement are intended and inserted solely for the convenience of reference and shall not affect the meaning, interpretation, construction or effect of this Agreement.

G.   Binding Effect:  This Agreement shall be binding upon GUARANTOR and its successors and inure to the benefit of COMPANY and COMPANY's successors and assigns.  No course of prior dealing among the parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof.  There are no conditions to the full effectiveness of this Agreement.  COMPANY may freely assign this Agreement without notice and without in any way affecting GUARANTOR's liability under it.

H.   Governing Law:  This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina, exclusive of the rules with respect to conflicts of law.

- 5 -

I.     Jurisdiction:  The state and federal courts located in Richland County, South Carolina shall be the exclusive forums for all litigation or other proceedings initiated by Guarantor under or in connection with this Agreement or the subject matter hereof.  GUARANTOR consents and submits to the jurisdiction of such courts and agrees that venue in such courts shall be convenient and proper in connection with all such litigation and proceedings.   GUARANTOR agrees not to commence any such action or proceeding in any other forum. GUARANTOR consents to service of process by U.S. mail in connection with any such litigation or proceedings.

J.     JURY TRIAL WAIVER:   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BETWEEN GUARANTOR AND COMPANY DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY DISPUTES RELATING HERETO.  GUARANTOR ACKNOWLEDGES THAT COMPANY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THIS WAIVER.

IN WITNESS WHEREOF, GUARANTOR, intending to be legally bound, has executed and delivered this Agreement through its duly authorized representative as of December 1, 2006.

_____
Charles David Wood, Jr.

- 6 -

# Exhibit C
## (Third Party Claims Administration Agreement)

EXHIBIT A

THIRD PARTY CLAIMS ADMINISTRATION AGREEMENT

This Third Party Claims Administration Agreement (the "Agreement") is made as of the date set forth on the signature page below by and between Aspen Administrators ("ASPEN") and Companion Property and Casualty Insurance Company ("CPCIC").

**WHEREAS,** this Agreement is the Third Party Claims Administration Agreement contemplated by that certain Coverage Agreement of even date herewith by and between CPCIC and Dallas National Insurance Company (successor by merger to Dallas Fire Insurance Company), AMS Staff Leasing Inc., a Florida corporation, AMS Staff Leasing II, Personnel Advantage East, Inc., a Florida corporation ("AEI"), and Equity Group Leasing I, Inc., a Florida corporation (the "Coverage Agreement");

**WHEREAS,** all terms not otherwise defined herein shall have the meanings ascribed to them in the Coverage Agreement;

**WHEREAS,** Aspen is engaged in the business of providing certain services with respect to the investigation, adjustment and payment of workers' compensation and commercial general liability insurance claims; and

**WHEREAS,** CPCIC desires to contract with ASPEN for the provision of its services relating to administration of the Policies (as defined in the Coverage Agreement) and claims asserted under the Policies ("Claims") and ASPEN desires to provide such services (the "Services") with respect to the Policies and Claims, on the terms and conditions set forth below;

**NOW THEREFORE,** in consideration of the mutual agreements, covenants, representations and warranties set forth below, ASPEN and CPCIC agree as follows:

| Article I  Provision of Services |
| --- |

A. Claims to be Serviced. ASPEN shall provide the Services with respect to each Claim that satisfies all of the following criteria (a "Subject Claim"):

1.  Involves an actual or alleged loss with a date of loss occurring during the term of a Policy;

2.  Is reported to ASPEN before the date on which this Agreement is cancelled pursuant to the provisions of Article V below, and

3.  Is within the discretionary settlement authority limit ("Authority Limit") set forth in the instructions contained in Exhibit A-1 ("Instructions").

B. Services to be Rendered. Except as otherwise directed by CPCIC, ASPEN shall provide to CPCIC in connection with the Policies and Subject Claims all administrative services customarily provided in connection with policies and claims similar to the Policies and Subject Claims, including without limitation the following:

1

1.    Establish a file with respect to each Claim in accordance with the Instructions.

2.    Investigate all Claims and to recommend the amount of loss reserve to be established with respect to each such Claim.

3.    Provide each Claim file with a written chronology of all actions taken with respect to the Claim.

4.    Furnish all claim forms and posting notices necessary for proper claims administration.

5.    Make all required claims related statutory/regulatory filings.

6.    Adjust, settle or resist all Claims within the Authority Limit.

7.    Retain defense counsel and monitor all litigation or other proceedings involving any Claim.

8.    Retain and then destroy files for each Claim in accordance with the File Retention and Destruction Policy set forth in the Instructions.

9.    Furnish CPCIC with such information regarding Claims and, if applicable, the AMS Claims Operating Account, in such periodic intervals, as set forth in the Instructions.

10.   Prepare and furnish to CPCIC on a timely basis all reports, accountings or other information with respect to underwriting as required by CPCIC from time to time.

11.   Prepare and furnish to any and all reinsurers on a timely basis all reports, accountings or other information required under any reinsurance agreements with respect to the Policies.

12.   Take appropriate action to protect any subrogation rights of CPCIC and any reinsurer of the Policies ("Reinsurer").  In the event of any Claim arises in whole or in part due to ASPEN's failure to provide the Services in compliance with this Agreement, CPCIC shall have the right to have any fees or charges actually paid in connection with said Claim returned to it or, at its option, credited against future fees and charges.

C. Claim Files.  At all times prior to and after the cancellation of this Agreement, all Claim files are owned by and are the property of CPCIC and shall be subject to no lien or other charge in favor of ASPEN.

D. Audits.  CPCIC or its employees and authorized agents, shall have the right to audit Claim files in the possession of ASPEN at any reasonable time, upon prior notice of five (5) business days during, or after the expiration of, this Agreement. CPCIC may visit, inspect, examine, and copy Claim files, and documents, reports, work paper and other

2

books and records in the possession of ASPEN relating to those Claim files, irrespective of whether the same are commingled with unrelated business records; provided, however, any such audit shall be conducted in accordance with the audit policies and procedures of CPCIC in effect from time to time.

E. Services Complaints.  In the event any governmental agency, broker or agent should contact ASPEN for any reason with respect to any Claims, (except for ordinary and customary contact not in the nature of the complaint), ASPEN will notify CPCIC and Reinsurer within five (5) business days of the nature of such communication and, if the communication is in writing, ASPEN shall send CPCIC and Reinsurer a copy thereof.

F. Retention of Counsel, Physicians, and Experts.  In the case of any claim, ASPEN may consult with CPCIC regarding the attorneys, physicians and other professionals or experts, which ASPEN may seek to retain in connection with its provision of the Basic Services.

---

### Article II  Fees and Charges

A. Fees.  In consideration of ASPEN providing Basic Services, CPCIC shall pay (solely from the Gross Direct Premium as defined in Exhibit A-2) and ASPEN shall accept those fees and other charges as are set forth in Exhibit A-2.  Payment of such fees and charges shall be made by CPCIC on a monthly basis.  ASPEN acknowledges and agrees that CPCIC has no obligation to make any payments in respect of this Agreement except out of Gross Direct Premium as defined in Exhibit A-2, and otherwise CPCIC's obligations under this Agreement are without other recourse of any kind.

B. Taxes.  It shall be the sole responsibility of ASPEN to remit any tax, which may be assessed under any existing or future law in any way relating to the sale, delivery or provision of services by ASPEN to CPCIC under this Agreement. CPCIC shall not have any responsibility with respect to any such tax beyond those fees and charges payable pursuant to Article II (A) above.

---

### Article III  Payment of Claims and Allocated Loss Expenses

A. Payment of Claims and Allocated Loss Expenses.  ASPEN shall make all payments with respect to Claims for losses and Allocated Loss Expenses (as defined in Article III (B) below) from the AMS Claims Operating Account in accordance with the procedures set forth in Exhibit A-4.  All claim payments under this Agreement in excess of $5,000.00 must be approved by CPCIC in writing (e-mail is acceptable).

B. Allocated Loss Expenses.  "Allocated Loss Expenses" means as much of the following expenses reasonably and necessarily incurred in connection with ASPEN provision of the Basic Services:

3

1.    Medical examinations of Claimants, including the reasonable and necessary transportation expenses of Claimants.

2.    Reports from attending or examining physicians.

3.    Attorneys' fees and disbursements.

4.    Court reporter services and transcripts.

5.    Stenographic services and transcripts.

6.    Witness attendance fees.

7.    Court costs.

8.    Appeal bonds.

9.    Printing costs related to trials and appeals.

10.   Testimony, opinions, appraisals, reports, surveys and analyses of professionals and experts.

11.   Trial and hearing attendance fees.

12.   Reports from government agencies or branches.

13.   Credit bureau reports.

14.   Private investigators.

15.   Photographs.

16.   Extraordinary claim investigation or travel expense incurred at the request of CPCIC.

17.   Any similar service related to the investigation and defense of a Claim, or the protection of the subrogation rights of CPCIC.

C. <u>Limitation on Payments</u>. All charges for allocated Loss Expenses shall not exceed the usual and customary local charges as reasonably determined by ASPEN except as may otherwise be specifically agreed by CPCIC and ASPEN.

4

---

### Article IV  Supply of Data

A. <u>Claims Reports</u>.  ASPEN shall provide CPCIC information relating to Claims, losses, and Allocated Loss Expense in both paper and tape or electronic file format as CPCIC may require which information shall be provided within ten (10) days following the end of each calendar month.

B. <u>Report is Condition Precedent</u>.  For as long as the information required by Article IV(A) above is not furnished to CPCIC, the obligations of CPCIC to make any payment of fees or other charges under Article II above shall be suspended.  CPCIC's obligation to make payment of fees resumes immediately upon receipt of the information.

C. <u>Additional Reports</u>.  Within twenty (20) days, or such shorter time period as may be required by a regulatory authority, of receipt of a request from CPCIC, ASPEN shall supply selected Claim, loss and other information as may be reasonably needed by CPCIC to respond to regulatory inquiries and examinations, or to prepare Annual Statements or other statistical or financial reports required of CPCIC.

D. <u>Payments to Providers</u>.  Notwithstanding any other provision in this Agreement, claims payment information for facility provider claims shall not include or disclose actual claims remittance payments to such providers except as otherwise required by law.

---

### Article V  Termination of Agreement

A. <u>Termination - Cause</u>.  This Agreement may be terminated for cause as follows:

    1.    <u>By CPCIC</u>, in the event of a breach of this Agreement by ASPEN, upon CPCIC giving ASPEN not less than thirty (30) days prior written notice; or;

    2.    <u>By ASPEN</u>, in the event of a breach of this Agreement by CPCIC, upon giving CPCIC and Reinsurer not less than thirty (30) days prior written notice.

B. <u>Notice and Opportunity to Cure</u>.  No termination of this Agreement by either CPCIC or ASPEN for cause shall become effective unless, prior to giving notice, the non-defaulting party first shall:

    1.    Give written notice to the defaulting party of the nature of the claimed breach, and

    2.    Shall set forth in such notice a period of time of not less than thirty (30) days within which the defaulting party must cure such breach, provided, however, that if the breach is not cured within the specified period, or if the breach is of a type not curable within such period, then no cancellation of this Agreement shall become effective unless the defaulting party has failed to diligently commence taking steps necessary to cure the breach

5

within the period and the default is not in fact cured within a commercially reasonable time thereafter.

C. <u>Termination - With Cause</u>. In the event this Agreement is terminated by either party for cause, CPCIC shall immediately assume complete responsibility for investigating, adjusting and settling all Claims and ASPEN shall immediately cooperate and return all Claims and related files to CPCIC so those services can be continued without interruption.

D. <u>Termination - Without Cause</u>. This Agreement may be terminated without cause by one hundred eighty (180) days written notice from either party to the other; provided, however, that termination shall not affect ASPEN's obligation to complete the investigation, adjustment and settlement of any Claims then outstanding or outstanding at the termination date.

E. <u>Disposition of Files</u>. Upon termination of this Agreement, CPCIC shall have the following options with respect to all Claims and Claim files then being handled by ASPEN by notice given to ASPEN not less than thirty (30) days prior to the effective date of termination of this Agreement:

    1.     All Claim files be returned to it, or

    2.     ASPEN shall continue to provide the Services for which ASPEN is responsible in accordance with Article I above with same fee schedule.

F. If no notice is given by CPCIC, then CPCIC shall be deemed to have selected option 2 in paragraph above. In the event CPCIC selects option 1 in paragraph above, ASPEN will promptly return all Claim files to CPCIC or its designee, at the sole expense of CPCIC and thereafter ASPEN shall have no further responsibility for investigation, adjustment and settlement of any Claims.

---

**Article VI Representations of ASPEN**

---

ASPEN represents and warrants as follows:

A. <u>Compliance with Laws</u>. ASPEN shall comply with all applicable federal, state and local governmental laws, rules, regulations and orders in the performance of its duties under this Agreement; and

B. <u>Licensing</u>. ASPEN is and shall remain duly authorized and licensed to perform its duties hereunder in each jurisdiction in which it shall act and, in furtherance thereof, it shall contract only with such parties who are also so duly authorized and licensed.

6

## Article VII  Insurance

A. Required Coverages.  For as long as ASPEN shall be obligated to provide the Services with respect to any Claim, ASPEN shall maintain general liability insurance, automobile liability insurance, workers' compensation insurance, fidelity insurance, errors and omissions insurance, and such other insurance coverages as are set forth in Exhibit A-3 hereto.

B. Coverage Terms and Limits.  The coverages required by Exhibit A-3 shall:

  1. Be written in amounts not less than those set forth in Exhibit A-3, and

  2. Include coverage of ASPEN obligations under Article VIII below.

C. Certificates of Coverage.  ASPEN will provide CPCIC with certificates of insurance reflecting such coverages are in effect as and when reasonably requested by CPCIC.

## Article VIII  Indemnity

A. Indemnification by ASPEN.  ASPEN shall be responsible to CPCIC and shall indemnify and hold harmless CPCIC, and all shareholders, officers, directors, employees and other agents of CPCIC, from and against any and all claims, suits, hearings, proceedings, actions, damages, liabilities, fines, penalties, losses, costs or expenses, including without limitation reasonable attorney's fees, caused by or resulting from any act or omission of ASPEN, or ASPEN's employees, representatives, and sub-producers unless the act or omission was done at the specific written direction of the CPCIC.

B. Benefit.  The indemnity provision set forth in this Article is made for the benefit of the indemnitees identified herein and may be enforced by any such indemnitee as if it were a party hereto.

C. Indemnification Survival.  No termination of this Agreement shall relieve either party of its obligations to indemnify under this Article.

## Article IX  Litigation

Forum.  The state and federal courts located in Richland County, South Carolina shall be the exclusive forums for all litigation or other proceedings initiated by either ASPEN or CPCIC under or in connection with this Agreement or the subject matter hereof. ASPEN and CPCIC each consents and submits to the jurisdiction of each such court, agrees to comply with all requirements necessary to that court's jurisdiction, and agrees that venue in such court shall be convenient and proper in connection with all such litigation and proceedings.  ASPEN and CPCIC each agrees not to (i) contest the jurisdiction or venue of such courts in any such action or proceeding, or (ii) commence any such action or proceeding in any other forum.  ASPEN and CPCIC each consents to service of process by U.S. mail in connection with any such litigation or proceedings.

## Article X Other Terms and Conditions

A. <u>Written Amendments</u>.  No amendment or waiver of any provision of this Agreement shall be effective or binding unless set forth in a writing signed by the party against whom enforcement is sought, and then any such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which it is given.

B. <u>Written Ratifications</u>.  No notice or any other communication given by ASPEN to CPCIC shall be construed to constitute CPCIC's approval or ratification of any matter contained or referred to in such notice, unless the same is consented to by CPCIC in writing.  Email communication will be allowed as an acceptable approval.

C. <u>Notices</u>.  All notices, consents, requests, demands, offers, reports or other communications required or permitted hereunder shall be in writing and sent by a prepaid receipted delivery service of the United States Postal Service, Federal Express, or United Parcel Service to the parties at their respective addresses set forth below.  All notices, consents or other communications shall be deemed given and received on the date set forth on the delivery receipt of the courier service in question.  A party may change its notice address by a notice to the other party given in accordance with this paragraph.

    If to ASPEN:

        Aspen Administrators, Inc.
        ATTN:  Charles David Wood, Jr.
        14160 Dallas Parkway, Suite 1500
        Dallas, TX 75274
        FAX:  (214) 647-2979

    If to CPCIC:

        Companion Property and Casualty Insurance Company
        ATTN:  Charles M. Potok, President
        51 Clemson Road
        Columbia, SC 29202-3165
        FAX:  803-865-3104

D. <u>Independent Contractor</u>.  ASPEN is an independent contractor, and is not an employee or agent of CPCIC.  ASPEN shall exercise its own independent judgment in the conduct of its business under this Agreement.  ASPEN shall protect and safeguard as a fiduciary CPCIC's interests in all matters arising under this Agreement.

E. <u>Binding Effect, Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of each party hereto and their respective successors and permitted assigns.  Neither party may assign its rights or obligations under this Agreement to a non-affiliate without the prior written consent of the other party.

8

F. Choice of Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of South Carolina without giving effect to any choice or conflict of law provision or rule (whether of the State of South Carolina or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of South Carolina..

G. Severability. If any provision herein is held to be illegal, void, or unenforceable, such finding shall not affect the remainder of this Agreement.

H. Entire Contract. This Third Party Claims Administration Agreement, together with the Exhibits attached hereto, which are all executed incident to a Coverage Agreement between Parties, constitutes the entire Agreement between the parties relating to the subject matter hereof, and there exist no other written or oral understandings, agreements or assurances with respect to such matters except as are set forth herein. Unless expressly stated, this Agreement confers no rights on any person or business entity that is not a party hereto.

**IN WITNESS WHEREOF**, the parties intending to be legally bound by their authorized representatives have executed this Agreement to be effective the date first written above.

**Aspen Administrators, Inc.**

By: _C. D. Wood fk_____

Title:_____


**Companion Property and Casualty Insurance Company**

By:_____

Title:_ Pres/CC_____

9

EXHIBIT A-1

| CLAIMS FILE INSTRUCTIONS |
| :---: |
| (including Authority Limits) |

1. Coverage/Compensability Requirements

    a. ASPEN will perform all necessary investigation and documentation upon which to base a decision regarding compensability on each Claim.

    b. ASPEN shall not assert that any Claim is not a claim covered by one of the Policies or decline to pay any Claim based on coverage without the approval of CPCIC if such approval is deemed necessary by ASPEN in its sole discretion.

    c. CPCIC or its designee shall provide ASPEN with coverage information, as requested, for each Policy.

    d. All coverage decisions will be made by CPCIC, ASPEN, and its Reinsurers having the right to consult in making those decisions.

2. Authority Limit

    ASPEN shall have the authority to investigate, adjust and settle any claim where the incurred loss shall be reasonably estimated to be $250,000 or less per claim. The adjustment and settlement of any claim in excess of $250,000 shall require the prior written approval of CPCIC.

3. File Retention and Destruction

    a. Closed Claim files shall be stored and maintained by ASPEN in a reasonable manner designed to protect the security and confidentiality of such files. CPCIC does not object to electronic storage of "closed" claim files.

    b. ASPEN shall destroy Claim files pursuant to CPCIC's then current record retention policy.

4. Litigated Claims

    c. ASPEN shall notify CPCIC and reinsurers immediately once any Claim receives an assigned trial date, whether such Claim exceeds or falls within the Authority Limit. This requirement shall not apply to administrative hearings before a Workers' Compensation Board or other regulatory body.

    d. ASPEN shall immediately notify CPCIC and reinsurers once any litigated Claim is submitted to the jury or other fact-finder (other than a Workers' Compensation Board), regardless of the existence of outstanding settlement offers or demands.

5. Reporting of Individual Claims

ASPEN shall report to CPCIC and the Claim file shall be duplicated and sent to CPCIC within seven (7) but not to exceed forty-five (45) days on the following Claims:

e.   Once an incurred loss (paid-to-date plus outstanding losses) on any Claim reaches the Authority Limit;

f.   Fatal injuries;

g.   Brain or spinal injuries;

h.   Amputation of an arm, leg, hand or foot; or more loss of use of an arm, leg or eye;

i.   Severe burns;

j.   Serious loss of use of any body function;

k.   Hospitalization of sixty (60) days or more;

l.   Sexual abuse, molestation or assault;

m.   Questions regarding the interpretation of coverage;

n.   Class action litigation;

o.   Alleged error or omission of the policyholder, CPCIC or ASPEN;

p.   Any demand for punitive or exemplary damages against any person arising from the handling of a Claim;

q.   Actual or potential conflict of interest between the policyholder, CPCIC or ASPEN or between CPCIC and ASPEN;

r.   Any proceeding naming CPCIC as a defendant or respondent, except those where CPCIC is nominally named as a procedural matter;

s.   Stroke or heart attack;

t.   Occupational disease;

u.   Back injuries where the disability exceeds 6 months; and

v.   Stress claims where the incurred loss exceeds $20,000.

11

6.  Form 1099 Reporting

ASPEN shall prepare and file all information returns, including 1099 forms, with respect to any payments made by ASPEN under this Agreement, including all payments rendered under the provision of Basic Services, as may be required under Section 6041 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

12

EXHIBIT A-2

## FEES AND CHARGES

Subject to paragraph 9 of the Coverage Agreement, ASPEN shall be reimbursed for its services for

a) Workers Compensation claims management at the rate of eight percent (8%) of the Standard Gross Manual Premium on the Policies on which Claims are adjusted by ASPEN.

b) Commercial General Liability claims management at the rate of eight percent (8%) of the Gross Written Premium on the Policies on which Claims are adjusted by ASPEN.

13

EXHIBIT A-3

## INSURANCE REQUIRED TO BE MAINTAINED BY ASPEN

Required Coverage Minimum Limits:

| | |
|---|---|
| General Liability | $1,000,000 / Occurrence<br>$1,000,000 / Aggregate |
| Automobile Liability | $1,000,000 CSL |
| Workers' Compensation | Coverage A - Statutory limits<br>Coverage B - $1,000,000 |
| Fidelity | $1,000,000 per loss |
| Errors and Omissions | $1,000,000 per loss |

14

EXHIBIT A-4

## CLAIMS AND ALLOCATED LOSS EXPENSE FUNDING PROCEDURES

A. Immediately upon making this Agreement ASPEN shall establish a regular bank checking account with Bank of America (the "Bank") entitled "AMS Claims Operating Account" in the name of CPCIC. Each month from the premiums received in respect of the Policies in excess of the guaranteed amount under paragraph 9 of the Coverage Agreement CPCIC shall (i) pay all reinsurance premiums for such month, pay all other general and administrative expenses for the month in respect of the Policies, and (iii) deposit any balance into the AMS Claims Operating Account. So long as CPCIC has any potential liability under the Policies the funds in the AMS Claims Operating Account and all earnings thereof shall be used for, and only for, the payment of claims under the Policies.

B. ASPEN shall be granted limited check writing authority over the AMS Claims Operating Account and ASPEN shall draw such checks solely to make payments of Claims for losses or allocated loss expenses ("ALE") in accordance with the terms of this Agreement.

C. Checks drawn on the AMS Claims Operating Account by ASPEN in excess of $5,000 shall be approved in writing by two authorized employees of ASPEN.

D. The AMS Claims Operating Account shall be funded as provided in the Coverage Agreement.

E. ASPEN shall notify CPCIC and its designee no later than the 15th day of each month of the amount of claims and ALE paid during the preceding month. ASPEN shall also notify CPCIC of the inception-to-date average claims and ALE costs at the time the monthly report is provided.

F. ASPEN shall not issue or authorize any check or other withdrawal from the AMS Claims Operating Account unless ready funds are on deposit sufficient to pay or cover any check or withdrawal.

G. Unless otherwise agreed, the AMS Claims Operating Account shall be maintained for as long as CPCIC shall have any potential liability in respect of any claims under the Policies.

H. At such time as ASPEN is no longer obligated to provide any Services under this Agreement with respect to any claim within the Authority Limit, ASPEN's authority over and obligation with respect to the AMS Claims Operating Account shall terminate. After all claims have been settled and all liabilities paid, and upon written approval by CPCIC, any remaining funds in the AMS Claims Operating Account may be released back to AMS

15

EXHIBIT A-5

| DATA ELEMENTS FOR CLAIMS REPORTS |
|---|

Within the timeframe established in the Agreement, ASPEN shall provide CPCIC, upon request, with a file containing the following information for Claims affected by any of the identified activities during the period covered by the report, or such other data as may be agreed upon by the parties:

Initial Claims Set Up

Insured's Name
Insured's City
Insured's State
Insured's Zip Code
CPCIC Policy Number
CPCIC Policy Effective Date
CPCIC Policy Expiration Date
CPCIC Company Issuing Policy (by company code)
Date Claim was reported to ASPEN
Date of Loss
ASPEN Claim Number
Loss Description (by NCCI code)
Loss Location City
Loss Location State
Loss Location Zip Code
Catastrophe Code (by Industry Ct Number)
Insured's Business
Jurisdictional State under Workers' Compensation Act
Average Weekly Wage (in $)

Claimant or Sub-file Set Up

Each Workers' Compensation Claimant / sub-file must be set up under a separate claim number.

Claimant's Name
Claimant's City
Claimant's State
Claimant's Zip Code
Notice of Claims Made Date (if applicable)
State of Claimant (O=Open; C=Closed)
Jurisdictional State under Workers' Compensation Act
Class Code (use NCCI class code)

16

<u>Line of Business Set Up for Claimant</u>

Claimant Number
Line of Business
Claim Reserve
Medical Reserve
Legal Reserve (use zero as default)

<u>Change Line of Business</u>

Claimant/Sub-file Number
Old Line of Business
New Line of Business

<u>Change Claimant Reserves</u>

Claimant/Sub-file Number
Line of Business
New Amount of Claim Reserve (not amount changed)
New Amount of Medical Reserve (not amount changed)
New Amount of Legal Reserve (not amount changed)

<u>Loss Payments</u>

Claim Number
Claim Dollar Amount
Claimant/Sub-file Number
Claimant Line of Business
Kind of Payment (claim / medical / expense)

<u>Close Claim, Claimant / Sub-file, or Line of Business</u>

Transaction Identifier
Claimant/Sub-file Number
Line of Business

<u>Control Totals</u>

Total Number of Claims
Total Dollar Amounts Paid
Total Outstanding Reserves

17