**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **HIGHPOINT RISK SERVICES LLC,** | § | |
| **and ASPEN ADMINISTRATORS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. 3:14-CV-3398-L(BH) |
| | § | |
| **COMPANION PROPERTY &** | § | |
| **CASUALTY INSURANCE COMPANY,** | § | |
| **a/k/a Sussex Insurance Company,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CHARLES DAVID WOOD, JR.; AMS** | § | |
| **STAFF LEASING, INC.;** | § | |
| **BRECKENRIDGE ENTERPRISES, INC.;** | § | |
| **and AMS STAFF LEASING II, INC.,** | § | |
| | § | |
| **Third-Party Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the order of reference dated May 6, 2016 (doc. 73 at 1),[1] before the Court for determination is *Defendant's Renewed Motion to Transfer Venue and Brief in Support*, filed October 23, 2015 (doc. 37), and *Plaintiffs' Motion to Strike Inadmissible Evidence Offered in Defendant's Appendix in Support of Defendant's Renewed Motion to Transfer Venue and Brief in Support*, filed April 1, 2016 (doc. 58). Based on the relevant filings and applicable law, the motion to strike is **GRANTED in part** and **DENIED in part**, and the motion to transfer is **DENIED**.

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

## I. BACKGROUND

On August 20, 2014 Highpoint Risk Services LLC (Highpoint) filed suit against Companion Property & Casualty Insurance Company n/k/a Sussex Insurance Company (Defendant) for assumpsit, common law indemnification, equitable subrogation, breach of implied contract, and attorneys' fees in the 134th Judicial District Court in Dallas County, Texas.  (doc. 1-1 at 3-16.) Defendant removed the case to federal court on diversity grounds on September 19, 2014.  (doc. 1 at 2.)  Aspen Administrators, Inc. (Aspen) was added as a required party under Rule 19(a)(1) on September 11, 2015.  (docs. 29, 33).

This case arises from Defendant's alleged failed to reimburse Highpoint and Aspen (Plaintiffs) for monetary advancements they allegedly made on Defendant's behalf related to a line of "pay as you go" or "PayGo" workers' compensation policies (the PayGo Policies).  (doc. 33 at 3-4.)  Defendant is a multiple-line insurer that offers its products through an independent agency system where licensed agents issue Defendant's insurance policies, collect premiums, and pay claims.  (*Id.* at 3.)  The PayGo Policies are unlike traditional workers' compensation policies in that the premiums for these policies are calculated based on a company's actual payroll and paid at the end of each pay period.[2]  (*Id.* at 4 n.1.)

Highpoint is a licensed insurance agency that solicits business in several states, including Texas, as an agent for insurers who provided various types of coverage, including workers' compensation and employer's liability insurance.  (*Id.* at 3.)  It was responsible for issuing the PayGo Policies, collecting and remitting premiums, distributing commissions, taxes and fees, and

_____

[2] In traditional workers' compensation policies, payment of annual premiums are based on a company's estimated payroll for the year.  (doc. 33 at 4.)

advancing funds to a claims payment account on behalf of Defendant.  (doc. 60 at 6-7.)  It also advanced funds on behalf of Defendant to Aspen and the various third-party administrators responsible for the payment of individual workers' compensation claims covered under the PayGo program.  (*Id.* at 7.)  Aspen is a third-party administrator that disbursed funds advanced by Highpoint under the PayGo Policies.  (doc. 33 at 8.)

## A.   The Agreements

### 1.   2005 Coverage Agreement

On December 1, 2005, Defendant entered into a coverage agreement (2005 Coverage Agreement) with Dallas National Insurance Company (DN) and several  professional employer or staff leasing organizations (the AMS Entities)[3] that were owned by Charles David Wood, Jr. (Wood).  (doc. 38 at 6-11.)  The AMS Entities were professional employer organizations whose clients primarily consisted of construction contractors other than general contractors.  (*Id.* at 6.)  For 6% of the gross written manual premium, Defendant agreed to issue one or more workers' compensation insurance policies to provide coverage of employees hired by the AMS Entities to work for their clients.[4]  (*Id.*)  Additionally, DN agreed to reinsure the first $5 million of risk (less

---

[3] The AMS Entities include AMS Staff Leasing Inc., AMS Staff Leasing II Inc., AMS Staff Leasing NA, Personnel Advantage East, Inc., and Equity Group Leasing I, Inc.  (doc. 38 at 6.)

[4] Under the terms of the agreement:

**Issuance.** [Defendant] shall issues the Policies as requested by AMS subject to the following requirements: (i) All AMS client companies with respect to which Policies are issued must meet the underwriting requirements established from time to time by [Defendant] and the reinsurers provided for herein; and (ii) the aggregate liability exposure of [Defendant] in respect of the Policies shall be acceptable to [Defendant] in its sole discretion. . . .

(doc. 38 at 6.)

3

any applicable deductible acceptable to Defendant), with the next $25 million to be reinsured by a

company acceptable to Defendant.  (*Id.* at 7.)  The 2005 Coverage Agreement expired on December

1, 2006.  (*Id.*)

### 2.   *2006 Coverage Agreement*

Defendant, DN, and the AMS Entities entered into a second coverage agreement (2006

Coverage Agreement) on December 1, 2006.  (*Id.* at 38-44.)  It provides, in part:

> **2.   Background**.  [The AMS Entities] are all professional employer
> organizations whose clients primarily consist of construction contractors other
> than general contractors.  These entities wish to obtain one or more workers[']
> compensation insurance policies to provide coverage over their employees
> serving these clients (the "Master Policies"). [Defendant] is also willing to write
> both high and low deductible workers' compensation and commercial general
> liability policies of insurance (together with the Master Policies, the "Policies")
> and [Companion] is willing to issue these Policies in states where it is licensed,
> subject to and in accordance with this Agreement and the requirements of
> applicable law.   DN agrees to provide reinsurance and underwriting and
> administrative services to [Defendant] for the Policies.
>
> . . .
>
> **7.   Issuance**. [Defendant] shall issue the Policies as requested by the
> AMS Entities . . .
>
> **8.   Reinsurance.**  With respect to (a) workers' compensation Policies,
> DN shall reinsure the first $5,000.000 of risk (less any applicable deductible
> acceptable to [Defendant]) under he Policies and (b) commercial general liability
> Policies, DN shall reinsure up to $500,000 of risk (less any applicable deductible
> acceptable to [Defendant] under the Policies, each pursuant to a reinsurance
> policy in form and substance acceptable to [Defendant].  The next layer of risk
> ($25,000,000 of risk for workers' compensation Policies and each of the balances
> of the risk over $500,000, if any, covered under each of the commercial general
> liability Policies) under the Policies shall be reinsured by a company acceptable
> to [Defendant] pursuant to a reinsured policy in form and substance acceptable to
> [Defendant].
>
> . . .
>
> **10.   Cost and Expenses**.  All cost and expenses incurred in connection
> with the Policies shall be the sole responsibility of the AMS Entities, jointly and
> severally, and [Defendant] shall have absolutely no liability whatsoever in respect

thereof. . . . Such costs and expenses shall also include . . .

> (v) A retail commission of 15.0% of the Standard Premium will be paid to [Highpoint] for production of Policies with respect to this Agreement.

. . .

**12.     Claims Administration**.  Aspen Administrators ("Aspen") shall act as third party claims administrator for [Defendant] with respect to the Policies pursuant to a Third Party Claims Administration Agreement . . . . Aspen Administrators shall invoice the appropriate AMS Entity for all incurred claims on a periodic basis and terms acceptable to [Defendant]. . . .

**13.     Claims Collateral**.  During the Coverage Term of the Master Policies, [Defendant] shall establish and maintain in its name with the Bank of America an account to serve as a claims reserve fund (the "Claims Reserve Fund").  At the commencement of the Coverage Term the AMS Entities shall make an initial deposit of $1,000,000 into the Claims Reserve Fund . . . . As actual claims are incurred the AMS Entities shall deposit into the Claims Reserve Fund the amount of such claims on a monthly basis . . . .

**14.     Letter of Credit**.  So long as [Defendant] has any potential liability under any Policy, an AMS Entity shall cause a Letter of Credit to be issued and maintained in favor of [Defendant] as beneficiary in the stated amount required by [Defendant] from time to time and payable upon written certification by [Defendant]. . . .

**15.     Guarantee.**  As an essential inducement to [Defendant] to enter into this Agreement and issue the Policies, Charles D. Wood, Jr. issued in favor of [Defendant] the guaranty and indemnity agreement . . . .

. . .

**21.     Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina without giving effect to any choice or conflict of laws provision or rule (whether of the State of South Carolina or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of South Carolina.

**22.     Litigation**.  The state and federal court located in Richland County, South Carolina shall be the exclusive forums for all litigation or other proceedings initiated by any Party under or in connection with this Agreement or the subject matter hereof.

(*Id.* at 38-42.)

5

### 3.     *Third Party Claims Agreement*

Aspen and Defendant also executed a Third Party Claims Administration Agreement (the

TPCA) on December 1, 2006, "for the provision of [Aspen's] services relating to administration of

the Policies (as defined in the [2006] Coverage Agreement) and claims asserted under the Policies."

. (*Id.* at 46-62.)  The TPCA provides in part that:

> this Agreement is the Third Party Claims Administration Agreement contemplated
> by that certain [2006] Coverage Agreement . . .
>
> all terms not otherwise defined herein shall have the *meanings ascribed to them in
> the [2006] Coverage Agreement*;
>
> . . .
>
> [Defendant] desires to contract with ASPEN for the provisions of its services relating
> to administration of the *Policies (as defined in the [2006] Coverage Agreement* and
> claims asserted under the Policies ("Claims") and ASPEN desires to provide such
> services (the "Services") with respect to the Policies and Claims.

(*Id.* at 46) (emphasis added).

The TPCA provided that the state and federal courts of Richland County, South Carolina,

were the exclusive forums for all litigation or other proceedings initiated by either Aspen or

Defendant "under or in connection with" the TPCA or its subject matter.  (*Id*. at 52.)

### 4.     *Guaranty Agreement*

On December 1, 2006, the owner of the AMS Entities, Wood, entered into a Guaranty and

Indemnity Agreement (the Guaranty Agreement) with Defendant.  (*Id.* at 64-69.)  He guaranteed all

the obligations of the AMS Entities under the 2006 Coverage Agreement, the TPCA, and the

"Policies."  (*Id.* at 64.)  The Guaranty Agreement had the same forum-selection clause as the 2006

Coverage Agreement and the TPCA, identifying "state and federal courts located in Richland

County, South Carolina . . . [as] the exclusive forums for all litigation or other proceedings initiated

by Guarantor under or in connection with this Agreement or the subject matter hereof." (*Id*. at 69.)

The 2006 Coverage Agreement, the TPCA, and the Guaranty Agreement (the Agreements) all provide that they shall be governed by and construed or interpreted in accordance with the laws of the State of South Carolina. (*See id*. at 42, 54, 68.)

### 5.      *Other Agreements*

Defendant and Redwood Reinsurance SPC, Ltd. (Redwood) executed a Workers' Compensation and Employer's Liability Quota Share Reinsurance Agreement (PayGo Agreement) on October 1, 2010.  (doc. 60 at 22-30.)  It covered "Workers' Compensation and Employer's Liability insurance underwritten and produced by Highpoint Risk Services Insurance Agency," and reinsured by Redwood. (*Id*. at 23.)  The agreement defined this as "the 'PayGo' business." (*Id.*)  Around October 2010, Defendant authorized Highpoint to serve as its agent for the PayGo Policies. (*Id.* at 5.)  It then filed agency appointments with regulators designating Highpoint as its agent in Texas, California, and other states. (*Id*. at 6.)  Under the program, Highpoint issued thousands of policies to persons or entities not associated with Defendant, DN, or Wood. (*Id*. at 5.)

DN was sold on March 1, 2012.  (doc. 60 at 280.)  Following the sale, DN was redomesticated from Texas to Delaware, and renamed Freestone Insurance Company (Freestone). (*Id.*)  On March 12, 2013, Freestone was sold to Lonestar Holdco, LLC (Lonestar), an entity owned and operated by Southport Lane Management, LLC (Southport).  (doc. 60 at 8.)  On April 1, 2013, Defendant, a wholly-owned subsidiary of Defendant, and DN, entered into a Program Agreement in which "DN and [Defendant] have an agreement . . . whereby DN or one or more Program Participants produces workers compensation, commercial general liability, and occupational

accident insurance business written on policies issued by [Defendant]."[5]  (doc. 38 at 86.)  As part of the Program Agreement, Southport Lane, LP entered into an guaranty and indemnity agreement in favor of Defendant.  (*See id.* at 95, 112-15.)

## B.    Parallel Litigation

On the same day it removed this case to federal court, September 19, 2014, Defendant filed suit against Plaintiffs, some of the AMS Entities, and Wood in the District of South Carolina (the South Carolina Action).[6]  (*See* docs. 1, 1-1, 3, 22.)  It asserted claims relating to the parties' alleged mutual obligations under the Agreements.  (*See* doc. 22-1 at 3.)  It also asserted a claim against Plaintiffs based on the PayGo Policies.  (*See id.* at 5.)

On October 16, 2014, Defendant moved to dismiss the claims asserted against it in this action, and alternatively for an order requiring joinder of Aspen as a party plaintiff, and to transfer venue to South Carolina.  (docs. 5, 6, 8.)  Defendant's motion for joinder of Aspen as a party plaintiff was granted on September 11, 2015.  (docs. 24, 29.)  The motion to transfer was denied without prejudice, and Defendant was granted leave to refile it on September 24, 2015, after Aspen was added as a plaintiff.  (docs. 25, 29, 32.)

The defendants in the South Carolina Action, including Highpoint, filed two motions to dismiss the claims against them.  (*See* doc. 22 at 1.)  On March 25, 2015, the South Carolina district court dismissed the tort claims and all but one of the contract-based claims for failure to state a claim, but it allowed the claim for an accounting to proceed.  (doc. 22-1 at 6-8.)  Notably, the Court

---

[5] Freestone was still known as DN when it entered into this agreement on April 1, 2013. (doc. 60 at 280.)

[6] *Companion Prop. & Cas. Ins. Co. v. Wood et al.*, No. 3:14-cv-3719-CMC (D.S.C.)

denied Plaintiffs' motion to dismiss Defendant's claim regarding the PayGo Policies without prejudice, and it stayed the proceedings on that claim until this Court resolved the motion to transfer venue.  (*Id*. at 5.)

## C.    Documents and Potential Witnesses

Kara Childress, the Chief Operating Officer of Freestone Insurance Company (formerly DN) from September 2012 until May 2013, avers that the management and oversight of the PayGo program was carried out by the employees of Highpoint, Aspen, and Freestone at their offices in Dallas, Texas, even though Defendant is the insurer on the PayGo Policies.  (doc. 60 at 1, 6-7.) Aspen was the designated third-party administrator for the PayGo program, and it was responsible for the payments, adjustment, and management of the vast majority of claims under the PayGo Policies.  (*Id*. at 7.)  The PayGo Policies were issued by Highpoint on behalf of Defendant, underwritten by Freestone's employees, and adjusted by Aspen or through its management of additional third-party administrators (except for policies written in Florida).  (*Id*. at 6.)

As noted, Defendant also issued workers' compensation policies to the AMS Entities pursuant to the 2005 and 2006 Coverage Agreements.  (docs. 38 at 6-11, 38-44; 60 at 9-10.)  The insurance claims that were  issued only to the AMS Entities (the AMS Policies) were underwritten by Freestone and/or Defendant, were adjusted by Aspen and other third-party administrators, and were reinsured by Freestone until April 1, 2012.  (doc. 60 at 9.)  Childress contends that although Plaintiffs and Freestone also managed and administered the AMS Policies, those policies were "separate and distinct" from the PayGo Policies.  (*Id*. at 10.)  Similarly, Kristen Wynn, controller of Highpoint, and the owner of AMS Entities both aver that the programs were "separate and distinct." (*Id.* at 126, 304.)  According to Jennifer Adams, Defendant's Program Administrator, the

PayGo Policies and policies issued to the AMS Entities were part of the same program.  (doc. 38 at 72, 80.)

Childress maintains that the records, files, claims, and documents associated with the PayGo program were always maintained separately from the records associated with the AMS Policies.  (doc. 60 at 10.)  She avers that all records[7] associated with the PayGo program have been maintained by Plaintiffs and Freestone at their offices in Dallas.  (*Id*. at 18-19.)  Adams, on the other hand, contends that Defendant maintains "countless volumes of records" associated with policies issued to Wood's insurance-related entities in Columbia, South Carolina.  (doc. 38 at 80.)

Childress lists 24 potential witnesses, including current and former employees of Plaintiffs and Freestone, and outlines their connections with the PayGo Policies.  (doc. 60 at 10-16.)  Adams lists 43 potential witnesses, including herself and current and former employees of Defendant, and their connection with policies issued to Wood's insurance-related entities.  (doc. 38 at 74-80.)

On September 11, 2015, the district court denied Defendant's motion to dismiss, added Aspen as an additional plaintiff, and ordered Highpoint to file an amended complaint adding Aspen as a plaintiff.  (doc. 29.)  It denied Defendant's motion to transfer without prejudice on September 24, 2015, and granted it leave to refile its motion to transfer.  (doc. 32.)  On September 25, 2015,

---

[7] Including, "all records, claims files, underwriting documents, policy jackets and endorsements, policyholder requests, communications and payroll documentation, premium reporting and payment data, policy and underwriting audit materials, invoices, billing records, audit endorsements, general claims correspondence, actuarial analyses, claims loss runs, policy profitability reports, regulatory correspondence and reporting, unit statistical and accounting reports, raw claims data from the Aspen software system, underwriting and claims system servers and databases, data import and claims automating software and programs, claims check registers, TPA banking records, Outside TPA contracts and correspondence, forensic accounting materials, agency licenses, wire transfers, settlement negotiations and all other records produced in connection with the PayGo Program."  (doc. 60 at 18.)

Plaintiffs filed their amended complaint.  (doc. 33.)  Defendant filed its renewed motion to transfer

on October 23, 2015. (doc. 37.)  Plaintiffs responded on April 1, 2016.[8]  (doc. 59.)

## II. EVIDENTIARY OBJECTIONS AND MOTION TO STRIKE

Plaintiffs objects to the declarations of Charles M. Potok, dated December 12, 2014 and

Jennifer Adams, dated October 23, 2015 that were provided in support of Defendant's motion to

transfer.  (doc. 58 at 2.)

### A.  Personal Knowledge

Plaintiffs first object to paragraphs 3, 4, 6, 19, 26, 27, 32, 33, 35, and 41 of Adams's

declaration on grounds that she has not provided a proper foundation to establish personal

knowledge of the facts to which she testifies.[9]  (*Id.* at 2-3.)  In support, Plaintiffs rely on Fed. R.

Evid. 602.  (*Id.*)  "A witness may testify to a matter only if evidence is introduced sufficient to

support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.

Personal knowledge may be proved by a witness' or an affiant's own testimony, or reasonably

inferred from his position or the nature of his participation in the matters to which he swears.  *See*

_____

[8] Defendant notes in a footnote in its reply that Plaintiffs' response is untimely.  (doc. 66 at 2.)  Plaintiffs' deadline to respond was initially extended from November 13, 2015 to December 4, 2015 by the district court.  (doc. 41.)  The district court then allowed a second extension until January 8, 2016.  (doc. 43.)  The district court entered a stay on all pending litigation deadlines, and extended Plaintiffs' deadline to respond until March 31, 2016.  (doc. 45) (noting "*No further extensions will be allowed*.")  Plaintiffs filed their response on April 1, 2016.  (*See* doc. 59 at 30) (noting that due to an "error in filing" it was not served until 12:04 AM on April 1, 2016).  Under local rules 6.1, "[a] pleading, motion, or other paper that is filed by electronic means *before midnight* central time of any day *will be deemed filed on that day*."  L.R. 6.1 (emphasis added).  Because Defendant does not object to or move to strike Plaintiffs' response, however, the response is considered.

[9] Without specifically addressing Potok's declaration in this section, Plaintiffs generally cites to paragraph 7 of his declaration.  (doc. 58 at 2) ("*see also id.* at 4 (paragraph 7 of the Potok Declaration).")  Because Plaintiffs do not address Potok's declaration in this section of their motion to strike, their apparent objection to paragraph 7 will not be considered.

*id.*; *Am. Motorist Ins. Co. v. Southcrest Constr. Inc.*, No. 3:04–CV–2575–M, 2006 WL 995202, *9 (N.D. Tex. 2006) (citing *DIRECTV v. Budden*, 420 F.3d 521, 529-30 (5th Cir. 2005)).   It may include inferences and opinions so long as they are grounded in personal observation and experience.   *See United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999).

Here, Adams's declaration avers that she was employed with Companion from July 2000 to August 2010 as a underwriter, and from September 2012 until January 2015 as the program administrator.  (doc. 38 at 70.)  Although several statement begin with "It is my understanding and belief," her declaration that "I have *personal knowledge* of the matters set forth herein." (*Id.* at 71) (emphasis added).  She testifies to Defendant's operations and relationship with Wood, Highpoint, and the PayGo Policies.  (*See id*. at 70-81.)  Based on her positions with Defendant and her familiarity with the details of its operations, she has the requisite personal knowledge to make the statements at issue.  Plaintiffs' objection is overruled.[10]

## B.    Parol Evidence

Plaintiffs next objects to paragraphs 4-6 of Potok's declaration and paragraphs 5, 7, 9, 10, and 12 of Adams's declaration on grounds that they "contain inadmissible testimony purporting to explain the understanding and intent of various integrated agreements." (doc. 58 at 3.)  They argue that under South Carolina law, which governs the construction of the agreements offered by Defendant, "the parol evidence rule generally excludes evidence which would give a perfectly clear agreement a different meaning or effect than that indicated by the plain language of the

---

[10] Because Plaintiffs' personal knowledge objection has been overruled, it is unnecessary to consider Defendant's other personal knowledge arguments regarding evidentiary standards.

agreement."[11] (*Id.* (quoting *First Am. Title Ins. Co. v. Columbia Harbison LLC*, No. 3:12-cv-00800-JFA, 2013 WL 1501702, at *1 (D.S.C. Apr. 11, 2013)).  Accordingly, because the two declarations contain "inadmissible parol 'evidence' regarding the intent and understanding of the agreements, they should be excluded."  (*Id.*)

Defendant does not dispute Plaintiffs' objection.  (doc. 69 at 5-6.)  It is granted, and paragraphs 4-6 Potok's declaration, and paragraphs 5, 7, 9, 10, and 12 of Adams's declaration are stricken.[12]

Defendant instead compares its evidence to that provided by Plaintiffs.  (doc. 69 at 6) ("Plaintiffs' declarants proffer precisely the same type of 'parol' evidence that Plaintiffs say is inadmissible and must be stricken from the Potok and Adams Declarations.")  It argues, "If the Court is inclined to strike these statements from Companion's Declarations, Companion respectfully requests that they are likewise stricken from Plaintiffs' declarations."  (*Id.* at 6 n.5.) This request does not comply with the local rules, however.  *See* L.R. 7.1.  Instead of submitting a motion, brief, and certificate of conference as required, its objection and request to strike is embedded in a footnote to its response to Plaintiffs' motion to strike.  The request is therefore not considered.[13]

_____

[11] The parol evidence rule is a "common-law principle that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing."  *Parol-Evidence Rule*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[12] Even if the paragraphs were considered, the recommendation for disposition on the motion to transfer would remain the same, because the language of the agreements are clear and parol evidence is unnecessary.

[13] Even if considered, Defendant fails to provide any specifics regarding what part of Plaintiffs' declarations should be stricken.

**C.**     **Hearsay and Best Evidence**

Plaintiffs also object to paragraphs 3-5, 7, 9, and 12-13 of Adams's declaration as containing inadmissible hearsay and violating the best evidence rule.[14]  (doc. 58 at 4.)

Except in limited circumstances, an out-of-court statement offered to prove the truth of the matter asserted is hearsay, and subject to certain exceptions, is not admissible as evidence.  *See* Fed. R. Evid. 801-05.  Additionally, the best evidence rule provides that an original writing, recording, or photograph is required to prove its contents unless the Federal Rules of Evidence or an Act of Congress provides otherwise.  Fed. R. Evid. 1002.  Under Rule 1003, a duplicate is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair ro admit the duplicate. Fed. R. Evid. 1003.

Here, in its entirety, Plaintiffs objects as follows:

> Third, the Adams Declaration purports to set forth the substance of various documents and agreements about which Ms. Adams does not have personal knowledge. *See* Doc. 38 at 71-74 (paragraphs 3, 4, 5, 7, 9, and 12-13 of the Adams Declaration). That testimony constitutes inadmissible hearsay and violates the best evidence rule. *See* FED. R. EVID. 802 and 1002; *Lifecare Mgmt. Servs., LLC v. Ins. Mgmt. Adm'rs, Inc.*, No. 3:08-CV-1641-M, 2010 U.S. Dist. LEXIS 85568, at *8-9 (N.D. Tex. Aug. 18, 2010) (striking declaration testimony under the best evidence rule). Therefore, the Court should also strike that testimony on those grounds.

(doc. 58 at 4.)  Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence it wishes to strike and stating the specific grounds for striking it. *Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006) (citing *United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004)).  Objections lacking specificity do not satisfy the requirements of Rule 103, and a loosely formulated and imprecise objection does not preserve error, however.  *Id.* (citing *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998).  "[A] trial court

---

[14] Plaintiffs make both objections together in its motion to strike.  (*See* doc. 58 at 4.)

judge must be fully apprised of the grounds of an objection." *Id.* Because Plaintiffs' hearsay and best evidence objections do not meet the specificity requirements of Rule 103(a)(1), they are overruled. *See, e.g., Hannon v. Kiwi Servs.*, No. 3:10–CV–1382–K–BH, 2011 WL 7052795, at *2 (N.D. Tex. Dec. 30, 2011), *adopted as modified*, 2012 WL 234650 (N.D. Tex. Jan. 24, 2012) (denying a motion to strike for lack of specificity).

### III.  FORUM-SELECTION CLAUSES

Defendant argues now that Aspen has been added as a plaintiff, this case must be transferred to the District of South Carolina due to the forum-selection clauses in the Agreements.  (doc. 37 at 7-14.)  The forum-selection clauses specify that all disputes relating to the agreements would be litigated in Richland County, South Carolina.  (*Id.*)  Defendant contends that "[t]ransfer will allow for the two cases to be consolidated in the District of South Carolina."  (*Id.* at 6.)

The presence of a valid forum-selection clause requires courts to adjust their usual analysis under 28 U.S.C. § 1404(a), as outlined in *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex.*, 134 S.Ct. 568, 581 (2013).[15]  A valid forum-selection clause should be given controlling weight in all but the most exceptional circumstances, and a district court should ordinarily transfer the case to the forum specified in that clause.  *See id.*  The *Atlantic Marine* analysis presupposes a contractually valid forum-selection clause.  *Id.* at 581 n.5.  In determining

---

[15] The analysis is adjusted in three ways.  *See Atl. Marine Const.*, 134 S.Ct. at 581.  "First, the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Id.*  "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests."  *Id.* at 582.  "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a  § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations."  *Id.* (citation omitted).

whether a contractually valid forum-selection clause exists, courts consider (1) whether the parties

agreed to a contractually valid forum-selection clause, and (2) whether the present case falls within

the scope of the forum-selection clause. *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 226-27

(5th Cir. 2008) (per curiam); *see, e.g., Brown v. Federated Capital Corp.*, 991 F. Supp. 2d 857, 860-

63 (S.D. Tex. 2014) (applying two-part test to a forum-selection clause).

Here, Plaintiffs do not dispute that the Agreements contain valid forum-selection clauses.

They assert that the Agreements are limited to the AMS Policies, however, and are not applicable

to the PayGo program. (doc. 59 at 14, 23 n.76)  They contend that the claims in this case arise solely

from the PayGo program, and therefore Defendant cannot meet its burden to show that the

Agreements, including their forum-selection clauses, apply to the specific claims asserted in this

action. (*Id*. at 13-14) ("Plaintiffs assert five claims for relief under the PayGo Program . . . . [which

do not] arise from, relate to, or rely on the 2006 Coverage Agreement or the Third Party Claims

Administration Agreement.").

A.    <u>Choice of Law</u>

"Because the forum selection clause is part of a contract, principles of contract interpretation

apply." *Your Town Yellow Pages, L.L.C. v. Liberty Press, L.L.C.*, No. 3:09-cv-0605-D, 2009 WL

3645094, at *3 (N.D. Tex. Nov. 2, 2009) (citation omitted).  In diversity actions, state law rules of

contract interpretation apply, and federal courts apply the choice-of-law rules of the forum state.

*See Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004); *Se. Inv., Inc. v. Clade*, No. 3:97-cv-

1799-L, 1999 WL 476865, at *3 (N.D. Tex. July 7, 1999) (citing *Triad Elec. & Controls, Inc. v.

Power Sys. Eng'g, Inc.*, 117 F.3d 180, 191 (5th Cir. 1997)).  Here, Texas's choice-of-law rules

apply.  Under Texas law, contractual choice-of-law provisions are generally enforced. *Smith*, 393

F.3d at 597 (citing *Access Telecomm., Inc. v. MCI Telcomms. Corp.*, 197 F.3d 694, 705 (5th Cir. 1999)); *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003).

The Agreements, including the 2006 Coverage Agreement, state that they are governed by South Carolina law.  (*See* doc. 38 at 42, 54, 68.).  According to South Carolina law, "[t]he cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  *McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009). Generally, the construction of contracts is a question of law for the court.  *Watson v. Underwood*, 756 S.E.2d 155, 161 (S.C. Ct. App. 2014) (citing *Hope Petty Motors v. Hyatt*, 425 S.E.2d 786, 789 (S.C. Ct. App. 1992)).  If a contract is unambiguous, extrinsic evidence cannot be used to give the contract a meaning different from what is indicated by its plain terms.  *Id.*  "A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one."  *Id.* (quoting *Jordan v. Sec. Grp., Inc.*, 428 S.E.2d 705, 707 (S.C. 1993)).  When the language is plain and capable of legal construction, the language alone determines the contract's force and effect.  *Id.*; *Jordan*, 428 S.E.2d at 707 ("The Court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully."). Construction by a party is only done when the contract is ambiguous or there is doubt as to its intended meaning.  *Watson*, 756 S.E.2d at 161.

**B.**     **Scope of Clauses**

    **1.**     ***2006 Coverage Agreement***[16]

The 2006 Coverage Agreement provides that the AMS Entities sought to obtain workers'

---

[16] Although Defendant's motion considers the TCPA first, (*see* doc. 37 at 7-14), the 2006 Coverage Agreement is considered first because its definitions are expressly adopted by the other two agreements.

17

compensation insurance policies to cover their employees, and it defines the policies as "Master Policies." (doc. 38 at 38.) It provides that Defendant is "also willing to write both high and low deductible workers' compensation and commercial general liability policies of insurance," and it defines those policies together with the Master Policies as the "Policies." (*Id*.) Both the Guaranty Agreement and the TPCA apply to the Policies, as that term is defined in the 2006 Coverage Agreement. (*See id.* at 40-41, 46, 64.) Plaintiffs contend that all of the Policies, both the Master Policies and the non-Master Policies, refer only to those policies issued to the AMS Entities. (doc. 59 at 19-20.) It argues that the Agreements are inapplicable to the PayGo Policies, which are not issued to the AMS Entities. (*Id*. at 21.) Defendant replies that "[t]he express wording of the 2006 Coverage Agreement encompasses policies issued to the AMS Entities as well as policies issued to third-party policyholders." (doc. 66 at 6.) It argues, "By its very terms, the 2006 Coverage Agreement applies to AMS 'Master Policies' issued to the AMS Entities, on the one hand, and to all other 'high and low deductible workers' compensation and commercial general liability policies of insurance' issued to third-party policyholders, on the other. The 2006 Coverage Agreement defines the term 'Policies' as including ***both*** categories." (*Id.*) (emphasis in original).

The 2006 Coverage Agreement is between Defendant and the AMS Entities (as well as Wood and DN), as opposed to between Defendant and Plaintiffs or any other Wood-related entities. (*See* doc. 38 at 38-44.) Pursuant to the 2006 Coverage Agreement, the AMS Entities control certain aspects of where and how all the Policies are issued, including the non-Master policies. For instance, Section 4 provides that all the workers' compensation policies "other than the Master Policies and Commercial General Liability Policies shall be issued in states as are mutually agreed between the Parties." (*Id.* at 38.) Similarly, in Section 7, the parties agree that Defendant shall issue

18

the Policies as requested by the AMS Entities, subject to certain exceptions.  (*Id*. at 39.)  The AMS Entities are not associated with the PayGo Policies.  If only the Master Policies were associated with the AMS Entities in the 2006 Coverage Agreement, then there would be no reason for the AMS Entities to be contractually responsible for, or take part in, deciding where and how the non-Master Policies were issued.

Further, the AMS Entities also agreed to be liable for the Policies.  Section 10 of the 2006 Coverage Agreement provides that "[a]ll costs and expenses incurred in connection with the Policies shall be the sole responsibility of the AMS Entities," and Section 12 provides that Aspen will invoice the appropriate AMS Entity for all incurred claims in its capacity as a third-party administrator for Defendant with respect to the Policies.  (*Id*. at 40.)  Section 14 also provides that as long as Defendant has potential liability under any Policy, "an AMS Entity shall cause a Letter of Credit to be issued and maintained in favor of Defendant as beneficiary . . . ."  (*Id*. at 41.)  If the non-Master Policies referred to in the 2006 Coverage Agreement were not issued to the AMS Entities, the entities would not agree to be liable for all costs and expenses incurred in connection with those Policies or to be invoiced for services done in connection with those Policies.

Based on the plain reading of the provisions in the 2006 Coverage Agreement, the term "Policies," in the agreement is not ambiguous and encompasses only those policies issued to the AMS Entities.

### 2.    *TPCA*

The TPCA is the sole agreement between Aspen and Defendant, and Defendant contends that this agreement is the only legal basis for Aspen's claim for reimbursement.  (doc. 37 at 8.)  It argues, "the term 'Policies' referenced in [the TCPA] encompasses all 'high or low deductible workers'

19

compensation policies,' which certainly includes the PayGo policies at issue here, which are simply workers compensation policies for which premium is paid on a per-payroll period basis." (*Id.* at 10.)

The TCPA was executed "incident to the [2006] Coverage Agreement." (doc. 38 at 54.) Because it expressly adopts the same meaning of "Policies" as defined in the 2006 Coverage Agreement, and that meaning was not found to be ambiguous, the term is likewise not ambiguous in the TPCA. Based on the plain reading of the provisions in the TPCA, the term "Policies" in the agreement encompasses only those policies issued to the AMS Entities.

### 3.    *Guaranty Agreement*

The 2006 Coverage Agreement expressly required, "[a]s an essential inducement to [Defendant] to enter into this Agreement and issue the Policies," that Wood issue an indemnity agreement  in favor of Defendant as part of the 2006 Coverage Agreement. (doc. 38 at 41.) Defendant argues that the Guaranty Agreement also includes a South Carolina forum-selection clause. (doc. 37 at 11.)

The Guaranty Agreement provides that Wood "hereby absolutely and unconditionally guarantees to [Defendant] the full and prompt performance and payment, when due, of all obligations of each [AMS Entity] under the [2006 Coverage Agreement, the Policies, and TPCA]." (*Id.* at 64.) Additionally, the agreement states that "[a]ll terms not otherwise defined herein shall have the meanings ascribed to them in the [2006] Coverage Agreement." (*Id.*) Because Wood guaranteed obligations of only the AMS Entities, and the agreement adopts the same meaning of words as the 2006 Coverage Agreement, the Guaranty Agreement only encompasses the policies issued to the AMS Entities.

In conclusion, the 2006 Coverage Agreement, TPCA, and Guaranty Agreement and their

forum-selection clauses are not applicable to the PayGo Policies that were not issued to the AMS

Entities.  Defendant has failed to meet its burden to establish that the forum-selection clauses in the

Agreements apply to the PayGo Policies, so its motion to transfer is appropriately decided under the

traditional § 1404(a) analysis.[17]

## IV.  §1404(a)

Defendant argues that all the applicable factors weigh in favor of transfer to the District of

South Carolina pursuant to 28 U.S.C. § 1404(a).  (doc. 37 at 20-25.)

A district court may transfer any civil case "[f]or the convenience of parties and witnesses,

in the interest of justice . . . to any other district or division where it might have been brought or to

any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

### A.      Proposed Transferee District

As a threshold matter, § 1404(a) requires a determination of whether the proposed transferee

district is one in which the suit might have been brought.  *In re Horseshoe Entm't*, 337 F.3d 429,

433 (5th Cir.  2003) (per curiam).  For all civil actions brought in a United States district court,

venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents
> of the State in which the district is located; (2) a judicial district in which a
> substantial part of the events or omissions giving rise to the claim occurred, or a
> substantial part of property that is the subject of the action is situated; or (3) if there
> is no district in which an action may otherwise be brought as provided in this section,
> any judicial district in which any defendant is subject to the court's personal
> jurisdiction with respect to such action.

28 U.S.C. § 1391(b).  Given that Defendant is a resident of, and is incorporated, in South Carolina,

---

[17] Because the Agreements are not ambiguous, extrinsic evidence is not allowed.
Defendant's extrinsic evidence, including its comparison of the 2005 Coverage Agreement to the
2006 Coverage Agreement, will not be considered.  (*See* doc. 37 at 14-18.)

Plaintiffs could have brought this action in the District of South Carolina.  (*See* docs. 1 at 2; 33 at 2); *see also* 28 U.S.C. § 1400(b).

## B.   Convenience to Parties and Witnesses

The next consideration is "the convenience of parties and witnesses."  *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir.  2004) (per curiam) (*Volkswagen I*); *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (*Volkswagen II*), *cert. denied*, 555 U.S. 1172 (2009).  The Fifth Circuit has adopted the *forum non conveniens* private and public interest factors.  *Volkswagen II*, 545 F.3d at 314-15 & n.9; *see also Volkswagen I*, 371 F.3d at 203.[18]  The movant must show that considering both the convenience of the parties and witnesses and the interest of justice under § 1404(a), the transferee venue is "clearly more convenient."  *Volkswagen II*, 545 F.3d at 315.

### 1.  Private Interest Factors

The private interest factors consist of "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Volkswagen I*, 371 F.3d at 203 (citing *Piper Aircraft Co. v. Hartzell Propeller, Inc.*, 454 U.S. 235, 241 n.6 (1981)).

#### a.  Relative Ease of Access to Sources of Proof

As to the first factor, Defendant contends that the parties will have easier access to documents and other sources of proof in South Carolina rather than Texas because voluminous records and other evidentiary materials are maintained in South Carolina.  (doc. 38 at 20-21.)

---

[18]A plaintiff's choice of venue is not a separate factor in the transfer of venue analysis. *Volkswagen II*, 545 F.3d at 314 n.10.  Rather, it is "to be treated as a burden of proof question," and "deference" to plaintiff's choice of venue is reflected in the movant's burden to show good cause for the transfer.  *See id.* (citation and internal marks omitted).

Adams avers that Highpoint produced 8,400 PayGo Policies that generated thousands of claims, and Defendant maintains "countless volumes of records" associated with the programs in Columbia, South Carolina.  (docs. 37 at 20-21; 38 at 80.)  Plaintiffs respond that they produced the PayGo Policies and experienced the claims, and that they and Freestone ran nearly all aspects of the PayGo program from their Dallas offices.  (doc. 59 at 26)  It contends that most of the documents and data related to the PayGo program were created by the Texas entities, and copies were provided to or obtained by Defendant.  (*Id*. at 26-27.)  Accordingly, it argues that at least as much data and documentation related to the PayGo program and its claims are located in Texas as in South Carolina.  (*Id*.)

The first private interest factor weighs in favor of transfer when evidence can be more readily accessed from the transferee district. *Internet Machines LLC v. Alienware Corp.*, No. 6:10–cv–023, 2011 WL 2292961, at *5 (E.D. Tex.  June 7, 2011).  Although documentary evidence is often stored electronically, courts still considers the physical location of the evidence. *Id.* (citing  *In re Genentech, Inc*., 566 F.3d 1338, 1345-46 (Fed. Cir. 2009)).  Here, the evidence presented by the parties shows that they have access to sources of proof and important, applicable documents in both venues.  Plaintiffs provide evidence that they generated most of the documents and data related to the PayGo program, and Defendant fails to provide any evidence that documents applicable to claims in this case were generated by it or are more easy to access in South Carolina.  Accordingly, Defendant failed to establish that this factor weighs in favor of transfer, and it is at best neutral. *See American General Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 398 (S.D. Tex. 2011); *Healthpoint, Ltd. v. Derma Sci., Inc.*, 939 F. Supp. 2d 680, 688 (W.D. Tex. 2013) ("Where . . . important documents are located in both venues, this factor does not weigh in favor of transfer."); *Metromedia*

*Steakhouses Co., L.P. v. BMJ Foods P.R., Inc.*, No. 3:07-cv-2042-D, 2008 WL 794533, at *3 (N.D.

Tex. Mar. 26, 2008) (concluding that this factor is neutral because documents were located in both

venues); *Perritt v. Jenkins*, No. 4:11-cv-MHS-ALM, 2011 WL 3511468, at *3 (E.D. Tex. July 18,

2011), *adopted by* 2011 WL 3511465 (N.D. Tex. Aug. 11, 2011) (finding this factor was neutral

where both parties had shown that relevant documents were located in both venues).

### b. Availability of Compulsory Process and Cost of Attendance of Willing Witnesses

The second factor, the availability of compulsory process to secure the attendance of

witnesses, favors transfer when a transferee district has absolute subpoena power over a greater

number of non-party witnesses. *Internet Machines*, 2011 WL 2292961, at *6 (citing *In re Hoffman-

La Roche Inc.*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009)). "'[T]he moving party must do more than

make a general allegation that certain key witnesses are needed', and must 'specifically identify the

key witnesses and outline the substance of their testimony.'" *Pension Advisory Group, Ltd.   v.

Country Life Ins. Co.*, 771 F. Supp. 2d 680, 710 (S.D. Tex. 2011) (quoting *Hupp v. Siroflex of

America, Inc.*, 848 F. Supp. 744, 749 (S.D. Tex. 1994)).  The third private interest factor is the cost

of attendance for willing witnesses. *Volkswagen I*, 371 F.3d at 203. "The Court must consider the

convenience of both the party and non-party witnesses." *Vargas v.  Seamar Divers Int'l, LLC*, No.

2:10–CV–178–TJW, 2011 WL 1980001, at *7 (E.D. Tex.  May 20, 2011) (citing *Volkswagen I*, 371

F.3d at 204 (requiring courts to "contemplate consideration of the parties and witnesses")).

Defendant argues that these factors weigh in favor of transfer because the parties will likely

be forced to subpoena nonparty and party witnesses who reside in South Carolina, beyond the reach

of this Court's subpoena power. (doc. 37 at 21) (citing Fed. R. Civ. P. 45(b)(2)).  It contends that

the  43 individuals identified by Adams in her declaration are "central to this dispute and thus will

likely be called to testify." (*Id.*)  Additionally, given the number of witnesses that reside in South Carolina compared to any potential Texas witnesses, the burden and expense of them traveling to Texas would be far greater than if the case was heard in South Carolina.  (*Id*. at 21-22.) Additionally, it argues that "[c]onsolidation would also avoid unnecessary piecemeal litigation and requiring many or all of these individuals to testify twice." (*Id.* at 22.)

Plaintiff responds that Adams's list "appears to have been 'padded' with individuals who likely have little actual relevant knowledge regarding the issues of this action," and that more material witnesses reside in Texas.  (doc. 59 at 25.)  In support they provide a list of 24 potential witnesses.  (doc. 60 at 10-16.)   They argues that Dallas, Texas, was undeniably the operational center of all the PayGo program activities, as the vast majority of management and oversight of the program was carried out by Plaintiffs and Freestone.  (doc. 59 at 24.)  They contend that persons who will be required to testify about the PayGo program and Defendant's claims reside mostly in or around Texas, and it lists the job functions of the several material witnesses it contends will testify in this action.  (*Id*. at 24-25.)

Here, Defendant simply produces a list of witnesses and outlines their roles and their involvement with Wood or the PayGo program.  (*See* docs 37 at 21-22; 38 at 74-80.)  It fails to specifically identify the *key* witnesses or outline the *substance* of their testimony.  *See Pension Advisory Group*, 771 F. Supp. 2d at 710 ("the moving party must do more than make a general allegation that certain key witnesses are needed, and must specifically identify the key witnesses and outline the substance of their testimony.") (citation and internal quotations omitted); *State Street Capital Corp. v. Dente*, 855 F. Supp. 192, 198 (S.D. Tex. 1994)("[T]he key witness analysis . . . dictates that it is not the number of witnesses but the importance of the witnesses that is

25

determinative."); *Continental Airlines, Inc. v. American Airlines, Inc.*, 805 F. Supp. 1392, 1396 (S.D. Tex. 1992) ("[T]he Court must primarily consider the convenience of the key witnesses. Indeed, the convenience of one *key* witness may outweigh the convenience of numerous less important witnesses. Thus, the party seeking transfer must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover.") (internal citation and quotations omitted).

Defendant's list appears to include persons who might have some knowledge of not just the PayGo Policies, but of any of the policies issued to any of Wood's insurance-related entities. (*See* doc. 38 at 74-80.) For example, one of the individuals identified by Defendant and Adams is listed as being "responsible for analyzing billing issues and security funds collected by Highpoint and held on behalf of [Defendant] insureds under the Woods Program." (*Id.* at 80.) Defendant notes that he is a current employee and a citizen and resident of South Carolina, but provides no other information about what his testimony will be or why he is a *key* witness. (*See id.*) Another witness included on Defendant's list is identified as a former employee who is a citizen and resident of Pennsylvania, and "has been involved in investigating a portion of the business produced by Highpoint under the Wood Program that is known as the 'Venus Program.'" (*Id.* at 79.) Similarly, Defendant provides no other information about what his testimony will be or why he is a *key* witness. (*See id.*)

Given each party's involvement with the PayGo Policies and program, both Defendant and Plaintiffs have key nonparty witnesses as well as willing witnesses who reside in their respective states. The second and third private factors do not, therefore, weigh in favor of transfer and are neutral at best. *See TGI Friday's, Inc. v. Great Northwest Restaurants, Inc.,* 652 F. Supp. 2d 750, 762 (N.D. Tex. 2009) (finding that because each party's potential witnesses reside in or near that

26

party's forum of choice, these two factors were neutral); *Pension Advisory Group*, 771 F. Supp. 2d at 711 (finding these factors were neutral where the same difficulties regarding the availability of the compulsory process to secure witnesses and the cost of attendance for witnesses who reside in the defendant's forum of choice could potentially arise if the action were transferred to that forum); *Healthpoint, Ltd.*, 939 F. Supp. 2d at 689 ("[W]hile [Defendant] claims to have witnesses in New Jersey, it has given the Court no reason to conclude that it would be more difficult to secure those witnesses' testimony in the Western District of Texas than it would be to secure the testimony of [Plaintiff's] witnesses in the District of New Jersey; and a court should not transfer venue on convenience grounds when doing so 'would merely shift the inconvenience to Plaintiff's witnesses.'")

### c.  Other Practical Problems

Defendant argues that all the "'other practical problems that would make trial easy, [expeditious] and inexpensive,' weigh in favor of transferring the case to the District of South Carolina."  (doc. 37 at 22.)  It contends that "[g]iven the entangled nature of this complex, multi-party set of related business dealings and the comprehensive nature and posture of the parallel proceeding in South Carolina, the overarching interests of justice overwhelmingly favor transfer." (*Id.*) Defendant does not specifically outline the "other practical problems," however.  The potential for consolidation of this case and the South Carolina Action is not by itself a practical problem.  This factor does not weigh in favor of transfer.[19]

### 2.  Public Interest Factors

In addition to considering the private interest factors, a court must also consider the *forum*

_____

[19] Any arguments specifically related to the "interest of justice" will be considered with that factor.

*non conveniens* public interest factors to see if they favor transfer. *Volkswagen I*, 371 F.3d at 203. They include "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict laws [or in] the application of foreign law." *Id.*

### a. Court Congestion

As to the administrative difficulties flowing from court congestion, Defendant argues that "trial would unquestionably be speedier if this case were transferred and consolidated with the South Carolina Action, where, unlike here, a trial date has been set and the case is progressing steadily." (doc. 37 at 19.)   In response, Plaintiffs note that Defendant failed to submit any evidence that the South Carolina court's docket is less crowded than the docket of the Northern District of Texas. (doc. 59 at 27.)   The parties do not dispute that this factor is neutral, however. (*See* docs. 37 at 19; 59 at 27.)   Additionally, the district court entered a scheduling order on May 17, 2016, setting this case for trial. (doc. 78.)   Accordingly, this factor is neutral.

### b. Local Interest

The second public interest factor is the local interest in having localized interests decided at home. *Volkswagen I*, 371 F.3d at 203.   Defendant contends that all relevant parties availed themselves of South Carolina's laws by doing substantial business with Defendant and by expressly subjecting themselves and their businesses to South Carolina law. (doc. 37 at 19-20.)   Plaintiffs respond that Texas's interest in the case is at least as strong as South Carolina's because both Plaintiffs' offices are located in Dallas, the harm to them occurred in Dallas, and the vast majority of the events giving rise to the dispute occurred in Dallas. (doc. 59 at 27-28.)

This case involves two Texas plaintiffs bringing suit against a South Carolina Defendant and business interactions between the parties that occurred on one side in Texas and on the other side in South Carolina. Texas, like South Carolina, has an interest in having localized interests decided at home. *See Pension Advisory Group*, 771 F. Supp. 2d at 711 (finding that in a case with Texas residents against non-Texas residents involving business interactions between the parties, both the Texas forum and the non-Texas forum had a significant interest in the matter); *see also Kelly Law Firm, P.C. v. An Attorney for You*, 679 F. Supp. 2d 755, 771 (S.D.Tex. 2009) ("[Defendant] argues that because its employees are all based in California and because 'the majority of the Plaintiffs are not Texas citizens,' the local interests favor venue in California. This argument may prove too much, since it would favor transfer to a defendant's home territory in any situation in which a defendant in one state did business with citizens in multiple other states. While California has a local interest in resolving the contract disputes of its citizens, Texas has the same interest.").

The second public interest factor therefore is neutral.

### c. *Familiarity with the Governing Law and Avoidance of Conflict of Laws*

The third public interest factor is "the familiarity of the forum with the law that will govern the case," and the fourth public interest factor is "the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Volkswagen I*, 371 F.3d at 203. Defendant states that transferring this case to South Carolina would not create a conflict of laws or require the Court to apply the unfamiliar law of another state because the agreements between the parties contain choice-of-law provisions that mandate the application of South Carolina law. (doc. 37 at 20.) Plaintiffs respond that the Agreements are not relevant to the claims at issue. (doc. 59 at 19-20.)

Because Defendant has not established that the Agreements are applicable to the PayGo

Policies, it has failed to establish that the choice of law provisions mandating the application of South Carolina law contained in the Agreements are applicable to the claims in this case. Accordingly, it has not established that South Carolina law governs the claims asserted against it in this case.  The third and fourth public interest factors do not weigh in favor of transfer.

Defendant has failed to carry its burden to show that a transfer of the case to the District of South Carolina is more convenient for the parties and witnesses.

**C.**   **Interest of Justice**

Courts should also consider the "interest of justice" under § 1404(a). *BNSF Railway Co. v. OOCL (USA), Inc.*, 667 F. Supp. 2d 703, 713 (N.D. Tex. 2009).  This phrase has been used by Courts as a basis to "avoid multiplicity of litigation as a result of a single transaction or event." *Id.* (citing *Seeberger Enters., Inc v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp. 2d 531, 541 (W.D.Tex. 2007)).  In order to "establish that the desire to avoid duplicative litigation weighs in favor of transfer, the moving party must discuss the manner in which the case to be transferred is related to the proceeding pending in the proposed transferee court with regard to facts, legal issues, and parties.  Without such discussion establishing extensive overlap between the suit and a realistic possibility of consolidation, this factor is afforded no weight." *Id.*

Here, Defendant relies on the progression of the South Carolina Action and the lack of a scheduling order in this case to conclude that "[t]he interests of justice thus tilt heavily in favor transfer."  (doc. 37 at 23.)  As noted, however, the district court entered a scheduling order in this case on May 17, 2016, setting this case for trial.  (doc. 78.)  Plaintiffs argue that it filed its claims in this action first and that Defendant in filing the South Carolina Action has engaged in "procedural maneuvers [that] should be seen for what they are: forum shopping."  (doc. 59 at 28.)  It contends

that this forum is favored as the forum for resolving all issues in dispute under the first-to-file rule, and that Defendant's duplicative claims should be dismissed or transferred to this Court.  (*Id.*)

According to the first-to-file rule, "when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). "The rule rests on principles of comity and sound judicial administration." *Id.* (citing *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997)).  "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* (quoting *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985)).  It allows courts to "maximize judicial economy and minimize embarrassing inconsistencies by prophylactically refusing to hear a case raising issues that might substantially duplicate those raised by a case *pending* in another court." *Id.* at 604 (emphasis original).

It appears that the only issues that substantially overlap in this case and in the South Carolina Action, and that implicate the first-to-file rule, are the claims regarding the PayGo Policies.  Given the forum-selection clauses in the Agreements, Defendant was required to file its claims regarding the AMS Entities in South Carolina.  However, there is no evidence of how the claims regarding the PayGo Policies are related to the claims regarding the AMS Entities, or to any of the other issues being litigated in South Carolina.  It does not appear, given the inclusion of Aspen in the case, that any of the other parties or issues involved in the South Carolina Action are needed in order for the dispute regarding the PayGo Policies to be resolved.  Similarly, it does not appear that resolution of the claims related to the AMS Entities is dependant upon the issues regarding the PayGo Policies.

As noted, the South Carolina court made a determination as to all the other claims subject to the motions to dismiss, but it stayed proceedings on the claim regarding the PayGo Policies until the determination on the motion to transfer venue in this case.  For this reason, there does not appear to be a risk of duplicative litigation or inconsistent results due to continuation of the present case in this forum.  Although consolidation is possible, Defendant has not established that transferring this case to South Carolina will involve extensive overlap and therefore serve the interest of justice or promote judicial economy.  Considering the interest of justice issue in addition to the "convenience of parties and witnesses" under § 1404(a), Defendant has failed to carry its burden of showing that the District of South Carolina is "clearly more convenient."  *Volkswagen II*, 545 F.3d at 315.

## V.  CONCLUSION

The motion to transfer is **DENIED**.

**SO ORDERED** on this 25th day of August, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

32